# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| NFS LEASING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| SA HOSPITAL ACQUISITION GROUP, LLC, | ) | |
| AMERICAN HEALTHCARE SYSTEMS, LLC, | ) | |
| and AMERICAN HEALTHCARE SYSTEMS | ) | |
| MISSOURI, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### AFFIDAVIT IN SUPPORT OF PREJUDGMENT WRIT OF ATTACHMENT AS AGAINST DEFENDANT SA HOSPITAL ACQUISITION GROUP, LLC

COMES NOW Plaintiff and for its Affidavit in Support of its Motion for Prejudgment Writ of Attachment as Against Defendant SA Hospital Acquisition Group, LLC submits the following:

1.    The undersigned is over 18 years of age and competent to make this affidavit.

2.    The undersigned is the Chief Financial Officer for NFS Leasing, Inc. ("NFS") and familiar with the file, records, and the lawsuit filed in the above styled case.

3.    The undersigned has reviewed the lawsuit filed in the above styled case and the Motion for Prejudgment Writ of Attachment ("Motion") and all facts and allegations contained therein are true and accurate to the best of my knowledge, except those alleged upon information and belief.

### The Lease Agreement.

4.    On April 26, 2021, SA Hospital Acquisition Group, LLC d/b/a South City Hospital ("SA Hospital") executed, in favor of NFS, Master Equipment Lease No. 2021-0233 (the "Master Lease" and together with Schedule 1 and all amendments and modifications thereto, the "Lease Agreement") identifying specific terms and equipment to be leased thereunder at SA Hospital's place of business, 3933 S Broadway, St. Louis, Missouri 63118 (the "Leased Equipment"). A true and accurate copy of the Lease Agreement is attached as **Exhibit 1**.

5.    The Leased Equipment consists of certain personal property owned by NFS, including medical devices and implements, used in a healthcare setting, a true and accurate copy of which is attached as **Exhibit 1**, at Schedule 1C.

6.    The present fair market value of the Leased Equipment determined by NFS is $2,113,599. A true and accurate copy of the itemized fair market value of the Leased Equipment as assessed by NFS is attached as **Exhibit 2**.

7.    Pursuant to paragraph 1.2 of the Master Lease, SA Hospital agreed: "It is expressly understood that the Equipment is, and at all times shall remain the personal property of Lessor. Lessee shall have no right, title or interest in the Equipment except as expressly provided herein." **Exhibit 1**, ¶1.2.

8.    Pursuant to paragraph 10 of the Master Lease, upon an "Event of Default," including a default for non-payment, NFS may require SA Hospital to assemble the Leased Equipment for pickup by NFS and/or for NFS to obtain possession of the Leased Equipment by summary proceeding or otherwise. **Exhibit 1**, ¶10.

9.    On March 26, 2021, NFS filed a UCC-1 financing statement governing the Leased Equipment (the "Leased Equipment UCC-1") in Delaware, SA Hospital's state of formation, to protect NFS's interests in the Leased Equipment and provide public notice that the Leased Equipment is NFS's property and not SA Hospital's property. A true and accurate copy of the Equipment Financing Statement is attached as **Exhibit 3**.

**The Security Agreement.**

10.    On April 26, 2021, in consideration of and inducement to NFS entering into the Lease Agreement, SA Hospital executed a Security Agreement, granting NFS a security interest in SA Hospital's "Equipment", as that term is defined under Article 9 of the Uniform Commercial Code (the "Collateral"). A true and accurate copy of the Security Agreement is attached as **Exhibit 4.**

11.    As defined in Article 9 of the Uniform Commercial Code, Equipment "means goods other than inventory, farm products, or consumer goods." In turn, "Goods" is defined as "all things that are movable when a security interest attaches. . . . The term also includes a computer program embedded in goods and any supporting information provided in connection with a transaction relating to the program if (i) the program is associated with the goods in such a manner that it customarily is considered part of the goods, or (ii) by becoming the owner of the goods, a person acquires a right to use the program in connection with the goods."

12.    The Security Agreement defines SA Hospital as the "Debtor" and provides, among other things, that that the Debtor warrants and covenants:

a.    Debtor will not sell, lease or transfer any of the Collateral or any interest therein (except in the ordinary course of business), without prior written consent of

4863-0925-5505, v. 1

Secured Party;

b.      Debtor will not sell, transfer or otherwise assign or dispose of any of the Collateral except in the ordinary course of business;

c.      Debtor will permit Secured Party, its officers, employees and/or agents, at all times, during normal business hours to enter into and upon any premises where the Collateral is located for the purpose of inspecting the Collateral, observing the Collateral's use and otherwise protecting the interests of Secured Party therein; and

d.      Debtor will notify Secured Party in writing, promptly, upon learning thereof . . . of the institution of any suit or administrative proceeding which may adversely affect the operations, financial condition or business of Debtor or Secured Party's security interest in the Collateral.

**Exhibit 4**, pp. 1-4.

13.    The Security Agreement further provides that SA Hospital shall be in default upon the occurrence of any one of the following:

a.      Default by Debtor or any guarantor in the due observance or performance of any covenant or agreement herein contained;

b.      Default in the payment when due of any Obligation or indebtedness of Debtor or any guarantor to Secured Party secured hereby;

c.      The placing of any attachment on any of the Collateral;

d.      The occurrence of any other default or Event of Default under any of the documents evidencing or securing the Obligations;

e.      The entry of a judgment against Debtor or Debtor's property or any guarantor or guarantor's property;

f.      The mortgage, pledge or assignment of Debtor's equipment, inventory, accounts receivables or other Collateral as defined above;

g.      Whenever, in Secured Party's sole opinion, Debtor's financial responsibility becomes impaired or unsatisfactory or the Collateral is not sufficient to secure fully any of the Obligations;

h.      Debtors ceases to conduct its business or is enjoined, restrained or in any way prevented by court order from conducting all or any material part of its business affairs; and

     i.     There is a material adverse change in the Collateral or in the business of Debtor.

**Exhibit 4**, pp. 4-5.

The Security Agreement also states: "Debtor understands and agrees Secured Party may exercise its rights hereunder without affording Debtor an opportunity for a preseizure hearing before Secured Party, through judicial process or otherwise, takes possession of the Collateral upon the occurrence of an Event of Default, and Debtor expressly waives its constitutional right, if any, to such prior hearing." **Exhibit 4**, p. 6.

14.     On March 25, 2021, NFS filed a UCC-1 financing statement (the "Collateral UCC-1") in Delaware, SA Hospital's state of formation, perfecting its security interest pursuant to the Security Agreement. A true and accurate copy of the Collateral Financing Statement is attached as part of **Exhibit 5**.

## **The Tri-Party Landlord Agreement.**

15.     On April 30, 2021, in consideration of and inducement to NFS entering into the Lease Agreement, NFS, SA Hospital, and SA Hospital's lessor under a ground lease, PI Broadway LLC (the "Landlord"), entered into a Tri-Party Landlord Agreement (the "Landlord Agreement"), whereby SA Hospital and Landlord each acknowledged the NFS Lease Agreement, NFS's ownership of the Leased Equipment, and the stated purpose of the Landlord Agreement in providing "for NFS to gain access to the Leased Equipment in the event Lessee defaults under the Equipment Lease and NFS exercises its rights thereunder to repossess the Leased Equipment." A true and accurate copy of the Landlord Agreement is attached as **Exhibit 6**.

16.     Paragraph 3 of the Landlord Agreement states:

> Each of the Lessee and Landlord hereby agrees that in the event of default declared by NFS under the Equipment Lease [between NFS and Lessee] . . . the Landlord is hereby authorized and directed, at NFS' option, to allow NFS or its designated agents to . . . remove the Leased Equipment and/or Collateral from the Premises . . . after NFS provides notice to Landlord of the Default. . . . Landlord further agrees that Landlord will not hinder NFS' actions in repossessing the Leased Equipment or exercising its rights with respect to the Collateral.

**Exhibit 6**, ¶3.

17.     Paragraph 10 of the Landlord Agreement further provides: "It is the intent of the parties that this Agreement shall be binding upon each of the party's successors, assigns, and personal representatives, upon any successor owner or transferee of the premises, and upon any purchaser, including any mortgagee, from Landlord." **Exhibit 6**, ¶10.

4863-0925-5505, v. 1

**SA Hospital irrevocably defaulted under the Lease Agreement in September 2022.**

18.    In September 2022, SA Hospital defaulted on its Lease obligations by failing to make payment of $86,736.10, exclusive of sales and use and personal property tax, required by the Lease Agreement.

19.    On November 3, 2022, NFS sent, or caused to be sent, a notice of default (the "Default Notice") to SA Hospital, as well as its principals and agents, Benjamin Klein, Lawrence Feigen, and Jeffrey Alholm.  A true and accurate copy of the Default Notice is attached as **Exhibit 7**.

20.    The Default Notice advised SA Hospital that NFS was entitled to certain remedies under the Lease as a result of the default, including repossession of the Equipment.  **Exhibit 7**.

21.    The Default notice further demanded that SA Hospital assemble the Equipment and make arrangements to allow for NFS to pick up the Equipment.  **Exhibit 7**.

22.    SA Hospital failed to cure the monetary default within the time prescribed in the Lease Agreement and Default Notice, and the default became irrevocable.

23.    On November 22, 2022, NFS sent, or caused to be sent, a notice to Landlord certifying SA Hospital's default (the "Landlord Notice") and requesting access to the premises to assess removal of the Leased Equipment on November 28, 2022.  A true and accurate copy of the Landlord Notice is attached as **Exhibit 8**.

**SA Hospital is actively attempting to sell the Leased Equipment and Collateral of NFS.**

24.    SA Hospital entered into an asset purchase agreement with American Healthcare Systems, LLC ("AHS LLC") and/or American Healthcare Systems Missouri, LLC ("AHS MO"; together, the "AHS Parties") in or about May 2022.  A true and accurate copy of the email communications between NFS and the AHS Parties are attached as **Exhibit 9** (Email Chain between NFS and the AHS Parties).

25.    The AHS Parties began controlling and operating SA Hospital in or about May 2022.  *See* **Exhibit 9** (Email Chain between NFS and the AHS Parties).

26.    Faisal Gill ("Gill") is an attorney and the registered agent of AHS LLC, a Virginia limited liability company. https://cis.scc.virginia.gov/EntitySearch/BusinessInformation?businessId=11116049&source=FromEntityResult&isSeries%20=%20false

27.    Gill is an agent of the AHS Parties.  **Exhibit 9** (12/21 Email).

28.    Aimee Gill is Faisal Gill's wife and the Chief Legal Officer of the AHS Parties. https://www.amhealthsystems.com/our-corporate-leadership-team/aimee-gill/

5

29.     Michael Sarian ("Sarian") is the Chairman and Chief Executive Officer of the AHS Parties. https://www.amhealthsystems.com/our-corporate-leadership-team/michael-sarian/

30.     Sarian is an agent of the AHS Parties. **Exhibit 9** (12/21 Email).

31.     The website for the AHS Parties states:

> American Healthcare Systems is a nationwide healthcare system based in Los Angeles, California. We believe in transforming hospitals by emphasizing quality, accessible and companionate care for all our patients and community members. American Healthcare Systems looks to improves each community it participates in by implementing new technologies, specialties and care specific to the needs of each community we serve.

https://www.amhealthsystems.com/our-corporate-leadership-team/

32.     By at least June 29, 2022, the AHS parties listed SA Hospital d/b/a South City Hospital as one of their "Locations" listed on their public website, as shown by internet archives: https://web.archive.org/web/20220629230446/https://www.amhealthsystems.com/

33.     On August 17, 2022, Lawrence Feigen of SA Hospital advised NFS that "Mr. Mike Sarian, principal of AHS" will be making monthly payments to NFS on behalf of SA Hospital moving forward. A true and accurate copy of email communications between NFS and the AHS Parties are attached as **Exhibit 10** (Feigen Email 8/17, 2:11 pm).

34.     On October 24, 2022, AHS MO filed a UCC-1 financing statement in Delaware, SA Hospital's state of formation, claiming a security interest in all tangible personal property of SA Hospital, which includes the Collateral and the Leased Equipment (and cannot be granted by SA Hospital because the Leased Equipment belongs to NFS). A true and accurate copy of AHS MO's UCC-1 financing statement is attached as **Exhibit 11**.

35.     In emails, Gill has represented that SA Hospital and the AHS Parties have not closed on the asset purchase agreement and, since at least December 2022, SA Hospital has been attempting to sell its assets to entities other than the AHS Parties. **Exhibit 9** (12/30, at 12:09 pm).

36.     Upon information and belief, the terms of the asset purchase agreement include the sale of the Collateral and the purported sale of the Leased Equipment which SA Hospital does not have the right to sell because the Leased Equipment belongs to NFS.

37.     As of today, the AHS parties continue to list SA Hospital d/b/a South City Hospital as one of their "Locations" on their website: https://www.amhealthsystems.com/locations/south-city-hospital/.

6

38. The AHS Parties continue to operate and control SA Hospital, including the Leased Equipment and the Collateral of NFS.

**SA Hospital and the AHS Parties have refused to make lease payments for six months and ignored all requests for access to and return of the Leased Equipment.**

39. On November 4, 2022, Jeff Alholm of SA Hospital advised NFS: "Our plan and expectation remain that either: NFS is paid off at the closing of the sale of the hospital business operations, or subject to the required approvals, the NFS outstanding balance and monthly payments are assumed by the new owner of the hospital business operations." A true and accurate copy of these communications are attached as **Exhibit 12** (Alholm Email 11/4, 5:42 pm).

40. On November 7, 2022, NFS notified SA Hospital that it may proceed with legal action if payment was not made as had been promised. **Exhibit 12** (Calumby Email 11/7, 12:39 pm).

41. Also on November 7, 2022, Jeff Alholm of SA Hospital responded that "you still can expect a complete response today to your prior email to resolve the matter." **Exhibit 12** (Alholm Email 11/7, 3:54 pm).

42. On November 17, 2022, Ben Klein of SA Hospital inquired whether the issue was resolved and was advised: "No this has not been resolved. NFS has not received the wire that was said to be sent (several times) nor have we received a wire confirmation." **Exhibit 12** (Calumby Email 11/17, 1:59 pm).

43. In December 2022, the AHS Parties, through Gill, negotiated with NFS to enter into a new lease agreement governing the Leased Equipment because of SA Hospital's default. *See* **Exhibit 9** (12/28, 10:11 am).

44. On December 28, 2022, Gill advised NFS via text messages that the new lease documents between NFS and the AHS Parties would be signed and returned and an initial wire payment made by the AHS Parties that day. *See* **Exhibit 9** (Calumby Email 12/28, 12:11 pm).

45. The AHS Parties did not execute the new lease documents and did not make an initial wire payment to NFS that day as promised. *See* **Exhibit 9** (Calumby Email 12/30, 11:24 am).

46. On December 30, 2022, Gill advised NFS that, although the AHS Parties had purchased the assets of SA Hospital through an asset purchase agreement, they had not closed on the sale, and that SA Hospital was actively seeking to sell its assets to a new buyer other than the AHS Parties. **Exhibit 9** (Gill Email 12/30, 12:09 pm).

7

47.   In response, NFS advised that ". . . without either a signed lease or the continued (and brought current) monthly rental payments for the continued use, NFS will need to begin to enforce our remedies under the Master Lease Agreement which would include the pickup and disposal of the equipment starting as early as next week [January 3, 2023]." **Exhibit 9** (Calumby Email 12/30, 11:24 pm).

48.   Between January 3, 2023, and January 19, 2023, Gill and the AHS Parties ignored all communications from NFS concerning payment for use of the Equipment and negotiation of the new lease. *See* **Exhibit 9** (1/3-1/19 Calumby emails).

49.   On January 20, 2023, Sarian on behalf of the AHS Parties agreed by phone to make a wire payment by close of business on Monday, January 23, 2023. *See* **Exhibit 9** (Calumby Email 1/23 3:09 pm).

50.   The AHS Parties did not make a wire payment on Monday, January 23, 2023. See **Exhibit 9** (Gill Email 1/23, 9:17 pm).

51.   Gill then promised that a wire payment would be made the next morning, Tuesday, January 24, 2023. **Exhibit 9** (Gill Email 1/23, 9:17 pm).

52.   On Tuesday, January 24, 2023, NFS inquired whether the wire payment had been initiated. *See* **Exhibit 9** (Calumby Email 1/24, 12:58 pm).

53.   Gill stated that a wire payment to NFS had been made. *See* **Exhibit 9** (Gill Email 1/24, 4:01 pm).

54.   The AHS Parties did not make a wire payment to NFS on Tuesday, January 24, 2023. *See* **Exhibit 9** (Calumby Email 1/25, 12:24 pm).

55.   On January 25, 2023, NFS inquired about why the wire payment had not been made and Gill advised that there was a hold on the AHS Parties' bank account. **Exhibit 9** (Calumby Email 1/25, 12:24; Gill Email 1/25 3:35 pm).

56.   AHS never made the wire payment. *See* **Exhibit 9** (Calumby Email 1/26, 8:55 am).

57.   On Monday, January 30, 2023, NFS wrote to AHS:

> It's now been a week since the commitment to wire over one monthly restructured (lowered) payment. While I understand there may be a hold on the operating entities bank account I have provided the suggestion to have the funds wired over from another entity as a show of good faith which has gone unanswered and ignored.
>
> NFS has acquiesced to all demands as part of the contemplated transaction for the continued use of our equipment as a show of partnership which has not been reciprocated. As such, should we

not receive a wire payment today NFS will proceed forward with replevin action to collect our equipment. In the event a sale of the hospital is consummated anything but a payoff of the lease debt will not be accepted.

**Exhibit 9** (Calumby Email, at 1:30 pm)

## A creditor obtains judgment against SA Hospital and/or the AHS Parties.

58.    Upon information and belief, a creditor of SA Hospital and/or the AHS Parties has obtained a judgment against one or both of those entities concerning SA Hospital's operations and/or debts, resulting in a bank account hold. *See* **Exhibit 9** (Gill Email 1/26, 1:05 pm)

## NFS's efforts to recover its equipment have been deliberately ignored.

59.    On January 10, 2023, an agent of NFS visited the SA Hospital premises to inspect and inventory the Leased Equipment, as it is entitled to under the Lease Agreement, Security Agreement, and Landlord Agreement, but was denied access. A true and accurate copy of the agent's inspection report is attached as **Exhibit 13**.

60.    On January 20, 2023, NFS wrote to the Landlord by email and certified mail, advising of the breach of the Landlord Agreement and demanding access to inspect the Leased Equipment and prepare for its removal. A true and accurate copy of the letter is attached as **Exhibit 14**.

61.    NFS subsequently learned that the Landlord had sold the property to a different entity, Twain GL XXV, LLC ("Twain"), by Special Warranty Deed, dated December 21, 2021, and sold the improvements on the property to SA Hospital Real Estate Holdings, LLC ("SA Hospital Holdings"), by Special Warranty Deed, dated December 21, 2021. Contemporaneous with the sales, Twain and SA Hospital Holdings entered into a ninety-nine year ground lease, evidenced by the Memorandum of Lease, dated December 22, 2021.

62.    Upon information and belief, SA Hospital Holdings is under common ownership or the control of SA Hospital and/or the AHS Parties.

63.    On January 25, 2023, NFS wrote to Twain by email and certified mail, advising of SA Hospital's default and requesting access to inspect and prepare for the removal of the Leased Equipment. A true and accurate copy of the letter is attached as **Exhibit 15**.

64.    On January 26, 2023, NFS wrote to SA Hospital Holdings by certified mail and FedEx, advising of SA Hospital's default and requesting access to inspect and prepare for the removal of the Leased Equipment. A true and accurate copy of the letter is attached as **Exhibit 16**.

4863-0925-5505, v. 1

65.   On February 1, 2023, NFS wrote to SA Hospital, the AHS Parties, and Twain by email, advising that it had received no response concerning access to the Leased Equipment and it would therefore file suit against them to recover its equipment if no response was received by Friday, February 3, 2023. A true and accurate copy of the email is attached as **Exhibit 17** (2/1 Barker Email 12:58 pm).

**The AHS Parties committed to paying again on February 6 and failed to make payment.**

66.   On February 3, 2023, Gill wrote to NFS stating that the AHS Parties (i) "are trying to resolve this issue with NFS," (ii) will proceed under the new lease agreement in principle reached with NFS, and (iii) "can wire the money on Monday." **Exhibit 17** (Gill Email 2/3 5:21pm).

67.   On February 4, 2023, NFS advised that it was willing to proceed, provided that it received the wire payment of $121,448.04, representing the January and February lease payments which were to be made by the AHS Parties, by the close of business on Monday, February 6, 2023. **Exhibit 17** (Barker Email 2/4 6:03 pm).

68.   On February 6, 2023, NFS advised Gill that it had not received the wire payment and requested Gill accept service of the instant lawsuit as the registered agent for AHS LLC. **Exhibit 17** (Barker Email 2/6 2:42 pm).

69.   On February 7, 2023, Gill responded: "I do not have any authority to accept service for SA Acquisition Group, which is the entity your contract is with. American Healthcare is not a party and until we close has not assumed any responsibility for your loan." **Exhibit 17** (Barker Email 2/7 1:14 am).

70.   Gill's ex post facto recharacterization of the Lease Agreement as a "loan" indicates that SA Hospital and the AHS Parties consider and are treating the Leased Equipment as their own personal property and not as the personal property of NFS, as expressly stated in the Lease Agreement.

**SA Hospital's continued, willful attempts to sell and transfer the Leased Equipment and Collateral away from NFS.**

71.   The current past due amount for SA Hospital's possession and use of the Leased Equipment, unpaid over the past six months under the Lease Agreement, is $482,694.55.

72.   In total, the past due amount plus all future and other amounts which SA Hospital owes to NFS under the Lease Agreement, exclusive of the fair market value of the Leased Equipment ($2,113,599), is $1,673,891.88, together with interest, attorneys' fees, other fees, expenses, and court costs.

73.   The AHS Parties believe that they have a lien on the "tangible personal property" of SA Hospital without qualification as demonstrated by the AHS UCC-1, despite NFS having properly filed the Leased Equipment UCC-1 and the Collateral UCC-1.

4863-0925-5505, v. 1

74.     For more than six months, SA Hospital and the AHS Parties have failed to make payment and have failed to permit NFS's recovery of the Leased Equipment, which NFS owns and is entitled to recover as expressly agreed by SA Hospital in the Lease Agreement, Security Agreement, and Landlord Agreement, and have therefore unlawfully converted and asserted ownership over NFS's personal property.

75.     By entering into the asset purchase agreement with the AHS Parties and attempting to sell assets to other unidentified parties, SA Hospital has attempted to sell and transfer the Leased Equipment and the Collateral of NFS in order to hinder and delay NFS as a creditor.

76.     By entering into the asset purchase agreement with the AHS Parties and seeking to sell assets to other unidentified parties, SA Hospital has attempted to sell and transfer the Leased Equipment and the Collateral in avoidance and frustration of its liabilities to NFS.

77.     By granting the AHS Parties a lien on all tangible personal property, SA Hospital has intentionally breached the Security Agreement, impaired the Collateral of NFS and ostensibly granted a lien on the Leased Equipment which it does not have the right to do because the Leased Equipment is owned by NFS.

78.     Based on the continued conduct of SA Hospital and the AHS Parties, the transfer of SA Hospital's assets and purported transfer of NFS' Leased Equipment is a fraudulent conveyance in deliberate disregard of the debt owed to NFS and wrongful conversion of the personal property of NFS.

79.     Based upon the foregoing, the undersigned believes there is a risk that SA Hospital and/or the AHS Parties, or whichever unidentified party that SA Hospital is seeking to sell its assets to, may seek to move the Collateral and/or Leased Equipment sought to be attached out of Missouri.

80.     In the absence of prejudgment attachment, there is significant risk that NFS will be left with inadequate recourse to recover the Collateral, its Leased Equipment and contract damages in light of SA Hospital and the AHS Parties' course of conduct in refusing to make lease payments, refusing to permit recovery of the Leased Equipment, continued attempts to convey its assets.

Further affiant sayeth not.

Dana Calumby
Chief Financial Officer

4863-0925-5505, v. 1

COMMONWEALTH OF MASSACHUSETTS   )
                                      ) S.S.

COUNTY OF ESSEX                            )

    On this 17th day of February, 2023, before me, the undersigned Notary Public, personally appeared Dana Calumby,  known to me (or proved by satisfactory evidence) to be the person whose name is subscribed to the within said instrument and acknowledged that he she executed the same for the purposes therein contained.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                   Notary Public

My Commission Expires:



4863-0925-5505, v. 1

# EXHIBIT 1



MASTER EQUIPMENT LEASE NUMBER 2021-0233

This MASTER EQUIPMENT LEASE ("Master Lease") is effective as of April 26, 2021 and is by and between NFS Leasing, Inc. ("Lessor"), a Massachusetts Corporation having its principal office at 900 Cummings Center, Suite 226-U, Beverly, MA 01915, with a fax number of (866) 805-3667, and SA Hospital Acquisition Group, LLC ("Lessee"), a Delaware limited liability company having its principal office at 3933 S. Broadway St. Louis, MO 63118, with a fax number of _____.

IN CONSIDERATION OF the mutual agreements contained in this Master Lease, the parties agree as follows:

**1. PROPERTY LEASED; TITLE:**

**1.1** Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the personal property, together with all replacements, parts, repairs, additions, attachments and accessories incorporated therein (individually called a "Unit of Equipment" or a "Unit" and collectively called the "Equipment") described in each Equipment Lease Schedule executed from time to time pursuant to this Master Lease and substantially in the form attached hereto as Exhibit A ("Schedule"). In no event shall Lessee have any right to substitute any similar equipment for any item of Equipment. As appears from Exhibit A, each Schedule to this Master Lease will consist of three sub-schedules, designated as A, B and C ("Sub-schedule"). Each such Schedule will be consecutively numbered and shall incorporate all of the terms and conditions of this Master Lease, and shall contain such additional terms as Lessee and Lessor shall agree upon. In the event of a conflict between the provisions of this Master Lease and a Schedule, the provisions of the Schedule shall prevail with respect to that Schedule. Sub-schedule A shall set forth the specific Equipment being leased thereunder, the initial term of the Schedule ("Initial Term"), and the periodic rent for such Equipment ("Monthly Rent"). Sub-schedule B shall set forth Lessee's purchase option with respect to such Equipment at the end of the Initial Term and Sub-schedule C shall constitute Lessee's acknowledgement that all such Equipment has been delivered to Lessee by Lessee's supplier (the "Supplier") of such Equipment. Sub-schedule C may also hereinafter be referred to as the "Acceptance Certificate".

**1.2** It is expressly understood that the Equipment is, and shall at all times remain the personal property of Lessor. Lessee shall have no right, title or interest in the Equipment except as expressly provided herein. If requested by Lessor, Lessee will obtain, prior to delivery of any Unit or at any time thereafter, a certificate satisfactory to Lessor from all parties with a real property interest in the premises where the Equipment shall be located, waiving any claim with respect to the Equipment ("Landlord Waiver"). In the event any Equipment will be located at a third party facility such as a data center, then the execution of Lessor's then current form of Tri-Party Agreement by Lessee and the owner of such third party facility shall be required prior to the delivery of any Equipment to such facility. If Lessor supplies Lessee with labels, plates or other markings stating that Lessor owns the Equipment, Lessee shall attach same in a prominent place on the Equipment.

**2. TERM; RENT:**

**2.1** The Initial Term for each Schedule shall commence on the first day of the month following the date Lessee accepts such Equipment as provided for in the below Section 4. ("Commencement Date") and shall continue until terminated in accordance with the provisions of this Master Lease. Lessee may terminate any Schedule as of the end of the Initial Term thereof by giving Lessor written notice, no earlier than 180 days and not later than 120 days prior to the last day of the Initial Term as set forth in Sub-schedule A. If Lessee does not give such written notice of termination, then notwithstanding any end of Lease purchase options set forth on the applicable Schedule, the Initial Term shall be automatically extended thereafter on a month-to-month basis at the same Monthly Rent, until terminated by Lessee giving the aforesaid written notice, which notice shall be effective on the last date of the month which is at least 120 days subsequent to the effective date of such notice. Any notice of termination must relate to all the Equipment subject to the Schedule to which the notice applies. If Lessee fails to timely return the Equipment or pay the Equipment purchase price, in accordance with the terms of this Master Lease and in the condition required herein, on or prior to the last day of the Initial Term, Lessee's notice of its intent to return or purchase the Equipment shall be null and void and Lessee shall be required to give a subsequent notice of its intent to return or purchase the Equipment, which notice shall be effective on the last date of the month which is at least 120 days subsequent to the effective date of such notice. In no event shall Lessee have the right to terminate any Schedule with respect to any Equipment prior to the expiration of the Initial Term except if due to damage or destruction of any such Equipment in accordance with the below Section 11.2 (b).

**2.2** Lessee's obligation to pay the Monthly Rent under each Schedule shall commence on the date such Equipment has been delivered to Lessee by the Supplier, notwithstanding the actual Commencement Date for such Schedule. For the purposes of this Master Lease, delivery will be defined as FOB origin. Lessee shall have seven (7) days following its receipt of any such Equipment to notify Lessor as to any missing Equipment, and its failure to do so shall be construed, as between Lessor and Lessee, as Lessee's acknowledgment that all such Equipment has been received by Lessee. In the event such Equipment is delivered to Lessee in multiple shipments, or for any other reason only partial delivery of such Equipment has occurred, Lessor shall provide Lessee with a calculation as to the pro rata amount due to Lessor as Rent based upon the Equipment actually received by Lessee for each such partial delivery. All Rent paid by Lessee prior to the Commencement Date shall constitute "Interim Rent". Lessee shall be obligated to pay such Interim Rent in an amount equal to 1/30th of the Monthly Rent for each day Lessee's Rent obligation commences in advance of the Commencement Date, less any pro rata adjustments on account of partial delivery of Equipment as aforesaid. Interim Rent shall be invoiced by Lessor on the first date of each month for the prior month's Interim Rent and shall be payable by Lessee within 5 days from the date such Invoice is received by Lessee. As of the Commencement Date, the Monthly Rent shall be payable in advance on the Commencement Date and on the first day of each successive month thereafter during the Initial Term of such Schedule or any extension thereof. Unless otherwise agreed by Lessor in writing, Monthly Rent shall be payable by Lessee to Lessor via ACH Direct or other electronic funds transfer service reasonably acceptable to Lessor. Lessee agrees to timely execute such authorizations as may be required by Lessor and/or ACH Direct or other similar service to allow direct electronic monthly payments to be made to Lessor. In the event any payment due hereunder is not received by Lessor within five (5) days after it is due, Lessee shall pay Lessor a late fee of $250.00 to cover Lessor's administrative and other costs. In addition to the forgoing late fee, Lessee shall pay interest on such overdue amounts at the rate of one and one-half (1 1/2) percent per month or the maximum interest rate legally permissible in the state specified in Section 29, whichever is less ("Late Payment Rate"), which interest shall accrue as of the date such payment was due. Upon Lessee's execution of any Schedule to this Master Lease, Lessee shall pay Lessor an amount equal to the first Monthly Rent payment for each Schedule or such other amount as set forth in Sub-schedule A.

**3. NET LEASE:** Each Schedule executed hereunder shall constitute a net lease and Lessee agrees that its obligation to pay all Interim Rent, Monthly Rent and other sums payable hereunder ("Rent"; "Interim Rent" and "Monthly Rent" are sometimes referred to herein together as "Rent"), shall be absolute and unconditional and shall not be subject to any refund, abatement, reduction, set-off, defense, counterclaim or recoupment ("Abatement") whatsoever, including without limitation, Abatements due to any past, present or future claims arising under this Master Lease, any Schedule or otherwise of Lessee against Lessor or any assignee of Lessor ("Assignee"), or against the manufacturer or seller of any Unit or against any person or entity.

**4. ACCEPTANCE:** Lessee represents and warrants that it has selected all Equipment and each Supplier based upon its own independent business judgment and expressly disclaims any reliance upon any statement or representation made by Lessor as to the quality of any such Supplier or the quality or suitability of any such Equipment for Lessee's intended use. Lessee shall execute an Acceptance Certificate at such time as the Equipment which is referenced thereon is delivered to Lessee by the Supplier. Any disputes concerning any defects or non-conformity of any Equipment shall solely be between Lessee and the Supplier and any such dispute shall not relieve Lessee of its obligation to pay any Interim or Monthly Rent due Lessor. The passage of seven (7) days from the date any such Equipment is delivered by Supplier, with no notice to the contrary shall constitute conclusive evidence of Acceptance by the Lessee regardless of whether or not the Acceptance Certificate has been executed and/or received by the Lessor. Lessee hereby authorizes Lessor to complete any missing or incomplete information on Lessee's behalf if an Acceptance Certificate has been returned incomplete. In the event Lessee fails to timely return any Acceptance Certificate, Lessee hereby authorizes Lessor to complete and acknowledge such Acceptance Certificate on Lessee's behalf.

**5. WARRANTIES; DISCLAIMER OF WARRANTIES:**

**5.1** Lessor warrants that (a) so long as no Event of Default has occurred and is continuing hereunder, (i) Lessee shall have the right of quiet and peaceful use, possession and enjoyment of the Equipment, subject to and in accordance with the provisions of this Master Lease, and (ii) notwithstanding any assignment, transfer, or grant of security interest by Lessor, neither Lessor nor any Assignee shall interfere with Lessee's said right of quiet enjoyment of the Equipment, and (b) as of the Installation Date, Lessor shall have title to the Equipment or the right to lease the Equipment to Lessee.

**5.2** LESSOR MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER INCLUDING, WITHOUT LIMITATION,

THE DESIGN OR CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS OR CAPACITY OR SUITABILITY OR DURABILITY FOR ANY PARTICULAR PURPOSE, THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE EQUIPMENT OR CONFORMITY OF THE EQUIPMENT TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR ORDERS RELATING THERETO, AND LESSOR EXPRESSLY DISCLAIMS THE SAME, AND, AS TO LESSEE, LESSEE LEASES THE EQUIPMENT "AS IS". LESSOR SHALL HAVE NO LIABILITY TO LESSEE FOR ANY CLAIM, LOSS OR DAMAGE CAUSED OR ALLEGED TO BE CAUSED DIRECTLY, INDIRECTLY, INCIDENTALLY OR CONSEQUENTIALLY BY THE EQUIPMENT, OR BY ANY INADEQUACY THEREOF OR DEFICIENCY OR DEFECT THEREIN, BY ANY INCIDENT WHATSOEVER IN CONNECTION THEREWITH, ARISING IN STRICT LIABILITY, NEGLIGENCE OR OTHERWISE. UNDER NO CIRCUMSTANCE SHALL LESSOR BE LIABLE TO LESSEE FOR ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE OR KIND HOWEVER ARISING, WHETHER UNDER OR IN CONNECTION WITH THIS AGREEMENT OR OTHERWISE, REGARDLESS OF LEGAL THEORY, INCLUDING, BUT NOT LIMITED TO, ANY DAMAGES OR LOSSES RESULTING FROM BUSINESS INTERRUPTION OR FOR LOST PROFITS. LESSOR'S LIABILITY TO LESSEE FOR ANY REASON SHALL IN NO EVENT EXCEED RETURN OF AMOUNTS PAID TO LESSOR BY LESSEE.

Notwithstanding the foregoing, provided no Event of Default shall have occurred or be continuing hereunder, during the Term of any Schedule Lessee shall be entitled to the benefit of any applicable manufacturer's warranties and such warranties are hereby assigned by Lessor to Lessee for the benefit of Lessee, to the extent assignable. As to new Equipment, Lessee acknowledges that Lessee ordered the Equipment from the supplier thereof, and either (a) Lessee received a copy of the contract by which Lessor acquired the Equipment or (b) Lessor has informed Lessee in writing, either previously or by this Master Lease of (i) the identity of the supplier, (ii) that Lessee may have rights under said contract and may be entitled, under the version of Uniform Commercial Code Article 2A ("UCC 2A") as in effect in the state specified in Section 29, to the benefit of warranties provided to Lessor by said supplier, and (iii) that Lessee may and should contact the supplier to receive an accurate and complete description of such rights including any disclaimers or limitations on them or of the remedies thereunder. Lessee makes this acknowledgement so that each such Schedule shall qualify as and be a "finance lease" under UCC 2A. To the fullest extent permitted by applicable law, Lessee hereby waives all rights and remedies against Lessor conferred upon a lessee by Article 2A of the UCC.

**6. LIENS; TAXES:**

**6.1** Lessee shall not directly or indirectly create, incur, assume or suffer to exist any mortgage, lien, security interest, charge, encumbrance or claim (each a "Lien") on or with respect to this Master Lease or any Schedule, the Equipment, title thereto or any interest therein except those Liens created by Lessor or Lessor's assignee, and Lessee shall immediately at its own expense take all action as may be necessary to discharge such Lien.

**6.2** Lessee shall file and pay all income, ad valorem, value added, leasing, leasing use, stamp or other taxes, levies imposts, duties, charges or withholdings of any nature arising out of the transactions contemplated herein and imposed against Lessor, Lessee, or the Equipment by any federal, state, local, or foreign government or taxing authority upon or with respect to the Equipment or upon the sale, purchase, ownership, delivery, leasing, possession, use, operation, return or other disposition thereof, or upon the Rent, receipts, or earnings, arising herefrom, or upon or with respect to this Master Lease ("Impositions"), excluding, however, Impositions on, or measured solely by, the net income of Lessor and franchise or similar taxes based on Lessor's business existence or status. Lessee shall reimburse Lessor for all Impositions to the extent paid by Lessor in accordance with the below Section 22. Lessee shall also reimburse Lessor for all sales or use taxes assessed on Rent, installation, transportation or any Imposition relating to any charge made by Lessor to Lessee. Lessee shall not report any Equipment as directly assessable to Lessee without the prior consent of Lessor. Lessor shall arrange for the preparation and filing of all personal property tax returns and the payment of any tax assessments related thereto and Lessee shall reimburse Lessor for such Impositions upon Lessor's demand. Lessor shall invoice, and Lessee shall pay estimated personal property taxes on a monthly basis during the term of the Master Lease. Lessor shall reconcile the estimated personal property tax collected from Lessee against the actual personal property tax billed by the taxing authority on an annual basis and shall invoice Lessee for any shortfall or credit Lessee for any excess. If filing by Lessee is required by law, or if requested by Lessor, Lessee shall prepare and file, or cause to be prepared and filed, all necessary filings for the assessment of any Impositions and shall promptly send Lessor a copy of such filing and submit to Lessor written evidence of Lessee's payment thereof. Lessee shall

reimburse Lessor for all expenses incurred from the preparation, filing and administration of such Impositions. Any tax returns filed by Lessee shall show Lessor as the owner of the Equipment. All payments and advances made by Lessor shall be deemed Rent, including but not limited to, all Impositions owed directly by Lessor for which Lessee has responsibility for reimbursement hereunder and all amounts advanced by Lessor to pay Impositions otherwise owed by Lessee.

**7. INDEMNIFICATION:** Except for matters solely attributable to Lessor's gross negligence or willful misconduct, Lessee shall indemnify and hold harmless Lessor, its assignees, successors or transferees and their respective employees, officers and/or agents (herein "Indemnified Persons"), from and against any loss (including any loss of tax benefits arising as a result of an act, omission or misrepresentation of Lessee), liabilities, damages, penalties, claims, suits, costs, expenses and disbursements at law or in equity, including attorney's fees, imposed on, incurred by or asserted against the Indemnified Persons arising out of the leasing, ownership, use, possession, control, maintenance, operation and transportation of the Equipment, including but not limited to, claims for patent, trademark or copyright infringement by Lessee and claims for property damage, personal injury or wrongful death arising in strict liability or negligence. All indemnities contained in any section of this Master Lease, including this Section 7, shall survive the expiration or other termination of this Master Lease or any Schedule with respect to acts or events occurring or alleged to occur prior to return of any Unit to Lessor and are expressly made for the benefit of, and shall be enforceable by any or all of the Indemnified Persons.

**8. USE; INSTALLATION; MAINTENANCE; INSPECTION:**

**8.1** Lessee shall comply with all laws, regulations, and orders of any governmental branch or agency which relate to the installation, use, possession or operation of the Equipment, and shall use the Equipment in the regular course of its business only, within its normal capacity, without abuse. Lessee shall remain responsible for all payments due under the Master Lease and any Schedules regardless of any changes to state or federal law regarding the installation, use, possession or operation of the Equipment.

**8.2** Lessee shall pay all applicable installation, transportation, rigging, unpacking and repacking, drayage, handling and insurance charges on the Equipment upon its initial delivery to Lessee. Upon the expiration or earlier termination of the Initial Term or any extension thereof, Lessee shall pay all such applicable charges in connection with the redelivery of the Equipment to such destination as is specified by Lessor within the continental United States of America ("Return Location").

**8.3** Lessee, at its own expense, shall maintain the Equipment in good operating condition, repair and appearance, and protect the same from deterioration other than normal wear and tear, and shall enter into, and keep in force a maintenance agreement with the manufacturer of the Equipment. Lessee shall cause the manufacturer to keep the Equipment in good and efficient working order, less normal wear and tear, in full compliance and in accordance with the provisions of such maintenance agreement and shall furnish evidence of such agreement to Lessor upon request. During Lessee's normal business hours, Lessee shall provide the manufacturer's field engineering representatives with access to the Equipment to install engineering changes necessary to keep the Equipment at currently announced engineering change levels. Upon deinstallation of any Unit, Lessee shall provide Lessor evidence from the manufacturer stating the Equipment is at currently announced engineering change levels and is qualified for the manufacturer's maintenance agreement.

**8.4** During Lessee's normal business hours, upon prior written notice to Lessee and subject to Lessee's reasonable security procedures, Lessee shall permit Lessor or its designee to inspect the Equipment, Lessee's equipment log and maintenance records.

**9. DEFAULT:** The occurrence of any of the following events shall constitute a default by Lessee hereunder ("Event of Default"):

(a) Lessee shall fail to pay when due any Rent, including any interest thereon, and such failure continues unremedied for a period of five (5) days after written notice thereof from Lessor to Lessee; (b) Except for defaults covered by Paragraph (a) above, Lessee shall fail to perform or observe any covenant, condition or agreement to be performed or observed by it hereunder and such failure continues unremedied for fifteen (15) days after written notice thereof from Lessor to Lessee; (c) Lessee shall have made any representation or warranty herein, or in any document or certificate executed by Lessee incidental hereto, which is found to have been false in any material respect at the time such representation or warranty was made; (d) Lessee, or any guarantor of Lessee's obligations hereunder ("Guarantor") shall cease doing business as a going concern, makes an assignment for the benefit of creditor, admits in writing its inability to pay its debts as they become due, files a voluntary petition in bankruptcy, is adjudicated a bankrupt or an insolvent, files a petition seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any present or future statute, law or regulation or files an answer admitting the material allegations of a petition filed against it in any such proceeding, consents to or acquiesces in

2

appointment of a trustee, receiver, or liquidator of it or of all or any substantial part of its assets or properties, or if it or its shareholders shall take any action toward its dissolution or liquidation; (e) Within thirty (30) days after the commencement of any proceedings against Lessee or any Guarantor seeking reorganization, arrangement, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such proceedings shall not have been dismissed or set aside, or if within thirty (30) days after the appointment, without Lessee's or Guarantor's consent or acquiescence, of any trustee, receiver or liquidator of it or of all or any substantial part of its assets and properties, such appointment shall not be vacated; or (f) Lessee shall attempt to remove, sell, transfer, encumber, part with possession, sublet or assign this Master Lease or any Equipment, except as expressly permitted hereunder. (g) Lessee or any Guarantor defaults (after the expiration of any applicable cure period) on any indebtedness for borrowed money or under any lease or installment sale obligation, provided that the Lessee's financial obligation for such indebtedness or obligation is at least $50,000.00 in any one instance or in the aggregate as to all such obligations then in default. (h) Lessee fails to obtain a Tri Party Agreement or Landlord Waiver executed by the applicable third party facility or owner of the real estate where the Equipment under corresponding Lease Schedule is located. (i) Lessee changes its name, form of business organization or state of organization without providing at least 30 days advance notice to Lessor and executing such additional documents as may be required by Lessor in connection therewith.

**10. REMEDIES:** Upon the occurrence of any Event of Default and at any time thereafter, Lessor may, with or without terminating this Master Lease and any Schedule hereto, in its sole discretion, do any one or more of the following: (a) proceed by appropriate court action to enforce performance by Lessee of the applicable covenants of this Master Lease or any Schedule; (b) accelerate and declare immediately payable all sums due and to become due hereunder for the full term of any and all Schedules to this Master Lease; (c) notify Lessee to assemble any and all Equipment for pick up by Lessor at a designated time and date. Lessee hereby agrees that 24 hours advance notice shall be sufficient for purposes of making such Equipment available for pick up by Lessor, and such Equipment shall be in the condition set forth in the below Section 13; (d) take possession (by summary proceedings or otherwise) of the Equipment without prejudice to any other remedy or claim referred to herein; (e) recover from Lessee, as liquidated damages and not as a penalty, an amount equal to the sum of (i) any then accrued and unpaid Rent or other payments owed hereunder plus interest thereon at the Late Payment Rate, (ii) the present value of all future remaining Rent contracted to be paid over the unexpired portion of the Initial Term of any outstanding Schedule discounted to present value at a rate equal to 5% per annum (the "Discount Rate"), plus interest thereon at the Late Payment Rate until paid and plus, if applicable, any lender breakage costs and/or prepayment penalty fees charged to Lessor; (iii) Lessor's estimate of the fair market value of the Equipment at the end of the Initial Term discounted to present value at the Discount Rate. The Discount Rate is hereby acknowledged by Lessee and Lessor as being commercially reasonable. In addition to the foregoing: in the event Lessor, in its sole discretion chooses to repossess any or all of the Equipment, Lessee shall be liable for the payment of all costs and expenses incurred by Lessor in connection with the repossession, recovery, storage, or repair, sale release or other disposition of any of the Equipment, including reasonable attorney's fees and costs incurred in connection therewith or otherwise resulting from Lessee's default; (f) re-lease or sell any or all of the Equipment at a public or private sale, with the privilege of becoming the purchaser or lessee thereof, and whether the Equipment is present or not and in such manner, terms and notice as Lessor shall deem reasonable, without any duty to account to Lessee or to mitigate any damages and thereafter Lessor shall apply the proceeds of any such sale or lease exclusively for the benefit of Lessor and in no event shall Lessee be entitled to any such proceeds; (g) exercise any other right or remedy which may be available to it under the Uniform Commercial Code or any other applicable law. A termination hereunder shall occur only upon notice by Lessor to Lessee in writing with an express reference to the UCC, otherwise any such action by Lessor shall be deemed a cancellation under 2A-505, and only as to such Schedules as Lessor specifically elects to terminate and, if applicable, this Master Lease and all remaining Schedules hereto shall continue in full force and effect. No remedy referred to in this Section is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity, and Lessee shall in any event be liable for all costs, expenses and reasonable attorneys' or other collection fees incurred by Lessor in enforcing this Master Lease or pursuing any remedy provided to Lessor hereunder. No express or implied waiver by Lessor of any default shall constitute a waiver of any other default by Lessee or a waiver of any of Lessor's rights. Lessee agrees that in the event Lessee refuses or otherwise fails to assemble and allow Lessor access to any Equipment which Lessor seeks to repossess in accordance with Lessor's rights under this Section, then in that event Lessor shall

be entitled to obtain injunctive relief against Lessee to recover possession of such Equipment. Lessee agrees that it shall not contest the reasonableness of the liquidated damages as set forth in this Section.

**11. DAMAGE; DESTRUCTION OR LOSS:**
**11.1** Upon delivery of the Equipment to Lessee and until the Equipment is redelivered to Lessor, Lessee shall bear the entire risk of loss, damage, or destruction with respect to the Equipment resulting from any cause whatsoever.
**11.2** If any Unit becomes damaged beyond repair, lost, stolen, destroyed or permanently rendered unfit, or in the event of any condemnation or requisition of title or use of any Unit by any governmental authority (any such occurrence being hereinafter referred to as an "Event of Loss"), then Lessee shall notify Lessor within 24 hours of such Event of Loss and shall notify Lessor within fifteen (15) days after the occurrence of an Event of Loss that it chooses to either: (a) At its expense, promptly replace the affected Unit with a newer unit of identical make, model, configuration, capacity and condition, in good repair, free and clear of all Liens, in which case any such replacement unit shall become the property of Lessor and for all purposes of this Master Lease shall be deemed to be the Unit which it replaced; or (b) Terminate the Schedule with respect to the affected Unit and pay to Lessor, an amount equal to the sum as calculated in Section 10(e) as of the date of the Event of Loss. Payments of Rent and other amounts due Lessor hereunder shall not be abated on account of any such Event of Loss and Lessee shall diligently pursue the replacement of or payment for the affected Unit(s), which in any event shall be completed within 60 days of the Event of Loss.

**12. INSURANCE:** Lessee shall, at its expense, insure the Equipment against all risks and in such amounts as Lessor shall reasonably require (but no less than the full replacement value) with carriers reasonably acceptable to Lessor, shall maintain a loss payable endorsement in favor of Lessor and Assignee affording to Lessor and Assignee such additional protection as Lessor and Assignee shall reasonably require, and Lessee shall maintain liability insurance reasonably satisfactory to Lessor. All such insurance policies shall name Lessee, Lessor and Assignee as additional insured and loss payees, and shall provide that insurance coverage shall not be canceled or altered without at least thirty (30) days prior written notice to Lessor and Assignee, and that no breach of warranty by Lessor shall invalidate such insurance with respect to any additional insured. Lessee shall furnish appropriate evidence of such insurance to Lessor and Assignee. In accordance with the provisions of the below Section 22, Lessor may procure such insurance on behalf of Lessee in the event Lessee fails to insure the Equipment in accordance with the provisions hereof.

**13. SURRENDER AND RETURN OF EQUIPMENT:**
**13.1 Surrender of Equipment:** Upon the expiration or other termination of any Schedule as provided for in this Master Lease, and provided Lessee has not duly exercised any applicable purchase option with respect to the Equipment, Lessee shall surrender and otherwise relinquish all control over the Equipment to Lessor.
**13.2 Condition of Equipment and Packaging:** At Lessee's expense, Lessee shall de-install the Equipment from Lessee's other systems and premises or any third party facility, and repackage the Equipment in its original packaging or otherwise package the Equipment in accordance with applicable manufacturer's recommendations. With respect to any software component of the Equipment, Lessee shall destroy all intangible items constituting such Software and shall deliver to Lessor all tangible items constituting such software, including but not limited to original certificate of authenticity issued by the licensor of such Software, if any, the end user license agreement, any CD-ROM, diskettes or other media relating to such Software. Lessee acknowledges that Lessee rights to the use any such software terminate upon the expiration or other termination of the applicable Schedule and Lessee shall not thereafter use any such software. If requested by Lessor, Lessee shall provide a written certification that Lessee has complied with the foregoing software return provisions and that it will not use any such software subsequent to the expiration or termination of the applicable Schedule. Lessee further agrees to authorize Lessor and/or the Vendor of such software to inspect all Equipment locations to verify compliance with the terms hereof. All Equipment shall be in the working condition specified in the above Section 8.3 and Lessee shall arrange and pay for all such repairs and work required as to any Unit of Equipment for the manufacturer to accept the Equipment at the time of surrender under the manufacturer's standard maintenance agreement. All Equipment shall be returned to Lessor free of any labeling or advertising placed thereon by Lessee. Any expenses incurred by Lessor on account of Lessee's failure to comply with this Section 13.2 shall be reimbursed by Lessee to Lessor in accordance with the provisions of the below Section 22.
**13.3 Return Location:** Lessee at its expense shall deliver the Equipment to such location within the continental United States as Lessor shall designate ("Return Location") and Lessee shall bear the risk of damage or loss until delivery of the Equipment to the Return Location.

**14. ASSIGNMENT BY LESSOR:** LESSOR MAY ASSIGN OR TRANSFER THIS MASTER LEASE OR ANY SCHEDULE HERETO OR LESSOR'S

3

INTEREST IN THE EQUIPMENT OR GRANT A SECURITY INTEREST THEREIN TO ONE OR MORE ASSIGNEES WITHOUT NOTICE TO LESSEE. Any Assignee of Lessor shall have all of the rights but none of the obligations of Lessor hereunder unless expressly agreed in writing, and Lessee agrees that it will not assert against any Assignee any defense, counterclaim or offset that Lessee may have against Lessor. Lessee shall have no greater obligations to any Assignee than it had to Lessor at the time of assignment, and such assignment shall not limit or otherwise restrict the rights afforded Lessee hereunder. Lessee hereby (i) consents to such assignments and/or grants, (ii) agrees to promptly execute and deliver such further acknowledgements, agreements, and other instruments as may be reasonably requested by Lessor or Assignee to effect such assignments and/or grants from time to time as each Schedule is executed and (iii) agrees to comply fully with the terms of any such assignments and/or grants. Lessee acknowledges that any assignment or transfer by Lessor made in accordance with the provisions of this Lease shall not materially change Lessee's duties or obligations under this Lease nor materially increase the burdens or risks imposed on Lessee. In the event of an assignment, all references herein to Lessor shall include Assignee.

**15. SECURITY DEPOSIT:** If requested by Lessor for any Schedule, Lessee shall pay to Lessor, as a security deposit ("Security Deposit"), the amount which is specified on such Schedule. The Security Deposit shall be paid upon Lessee's execution of such Schedule and will be returned to the Lessee within thirty (30) days of the Expiration Date, provided that (i) all the Equipment under the Schedule has been returned to Lessor at the place and in the condition required herein or has been purchased in accordance with the end of Lease options on the applicable Schedule and (ii) there are no uncured Events of Default by Lessee under the Lease. Lessor shall have the right to deduct from the Security Deposit any amount not paid to Lessor when due. No such deduction shall diminish Lessee's obligation to pay any and all sums due Lessor and any amounts deducted from the Security Deposit which are subsequently paid by Lessee shall be used to restore the Security Deposit to its original amount. Upon demand from Lessor, Lessee shall pay the amount necessary to so restore the Security Deposit. Lessee agrees that the Security Deposit may be co-mingled with Lessor's other funds and that no interest shall be due to Lessee on account of the Security Deposit. Lessor's failure to require a Security Deposit on any Schedule shall not affect its rights to require a Security Deposit on any subsequent Schedule.

**16. ASSIGNMENT OR SUBLEASE BY LESSEE:** LESSEE SHALL NOT ASSIGN OR IN ANY WAY DISPOSE OF ALL OR ANY PART OF ITS RIGHTS OR OBLIGATIONS UNDER THIS LEASE OR ENTER INTO ANY SUBLEASE OF ALL OR ANY UNIT OF EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR, WHICH CONSENT SHALL NOT BE UNREASONABLY WITHHELD SUBJECT TO THE FOLLOWING CONDITIONS WHICH SHALL APPLY SEPARATELY TO EACH SUCH PROPOSED ASSIGNMENT OR SUBLEASE: (a) Equipment shall not be relocated outside of the United States of America; (b) Lessee shall give to Lessor written notice of the requested assignment or sublease which notice shall include the identity of the proposed lessee thereof ("Subsequent Lessee"), any proposed new location of the Equipment, and a true copy of the proposed Assignment or Sublease agreement including all terms and provisions thereof; (c) Lessee shall furnish or cause to be furnished to Lessor such financial and other information concerning the Subsequent Lessee as Lessor may request; (d) No sublease or assignment shall in any way discharge or diminish any of Lessee's obligations to Lessor under the Master Lease or any Schedule thereto and Lessee shall pay any excess Rent paid by the Subsequent Lessee over to Lessor; (e) The Subsequent Lessee shall agree to comply with all terms and provisions of this Master Lease and the applicable Schedules and shall furnish such proof of insurance and other documents required under this Master Lease to Lessor. Lessee shall assign its rights under any permitted assignment or sublease to Lessor or Lessor's Assignee as additional collateral and security for the performance of Lessee's obligations hereunder; and (f) Lessor shall have 30 days from the date it receives all required or requested information concerning such assignment or sublease to notify Lessee that it either consents thereto or specifying the reasons it does not consent. If consented to, any such assignment or sublease shall be effective as of the date the next Rent payment is due under the applicable Schedules. Lessee agrees that for purposes of this Section 16, a transfer of 50% or more on the ownership interest in Lessee, or a sale or transfer of substantially all of Lessee's assets shall be deemed to be an assignment.

**17. RELOCATION:** Lessee shall not move or permit to be moved any Equipment from the Equipment Location without the prior written consent of Lessor, which consent shall not be unreasonably withheld; provided, however, in no event shall any Equipment be moved to a location outside the United States of America, and further provided that all manufacturers' original warranties and maintenance programs shall continue to remain in effect subsequent to any such relocation. Risk of loss and all costs and expenses incurred in connection with any movement of Equipment shall be the responsibility of the Lessee.

**18. ALTERATIONS AND MODIFICATIONS:** Lessee shall not make modifications, alterations or additions to Equipment (other than normal operating accessories or controls) without the prior written consent of Lessor, which consent shall not be unreasonably withheld. Notwithstanding the foregoing, Lessee shall be entitled to acquire and install, at Lessee's expense, such additional features or options ("Modifications") which (i) will not impair the originally intended function or use of the Equipment in which the Modifications are installed, (ii) will not require removal of any part of the Equipment, (iii) will not interfere with Lessee's ability to obtain and maintain the maintenance contract required by Section 8.3 and (iv) the addition of which will not have an adverse impact upon the value of the underlying Equipment or Lessor's rights therein. Such Modifications shall be of the type which are readily installed and removed without damage to the Equipment so as to restore the Equipment to the condition in which it existed prior to the installation of such Modifications provided, however, that if Lessor so agrees in writing, Lessee shall not be required to remove such Modifications. Any Modifications not so removed shall become the property of Lessor. All Modifications must qualify for the manufacturer's maintenance agreement and be maintained in accordance with Section 8 hereof. Lessee shall grant to Lessor the right and opportunity to first submit or match the last proposal for the lease, financing or supply of any Modification.

**19. REPRESENTATIONS AND WARRANTIES OF LESSEE:** Lessee represents and warrants for the benefit of Lessor and any Assignee: (a) Lessee is a legal entity, duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and is in good standing in each jurisdiction where the Equipment will be located and has adequate corporate power to enter into and perform this Master Lease and each Schedule; (b) This Master Lease and each Schedule have been duly authorized, executed and delivered by Lessee and constitute a valid, legal and binding agreement of Lessee, enforceable in accordance with their terms, subject to enforcement limitations imposed by state or federal laws generally affecting the rights of creditors and general equitable principles; (c) The execution and delivery of and the performance by Lessee of its obligations under this Master Lease and each Schedule will not violate any judgment, order, law or governmental regulation applicable to Lessee or any provision of Lessee's articles of incorporation, by-laws or other organizational documents or result in any breach of or constitute a default under any instrument or agreement to which Lessee is a party or by which Lessee or its assets may be bound or result in the creation of any Lien; (d) To the best of Lessee's knowledge, and after diligent inquiry, there are no actions, suits or proceedings pending before any court, administrative agency, arbitration tribunal or governmental body which will, if determined adversely to Lessee, materially adversely affect its ability to perform its obligations under this Master Lease, each Schedule or any related agreement to which it is a party; (e) Lessee is not a tax exempt entity under the Internal Revenue Code of 1986 as amended; and (f) All information concerning Lessee's business organization, business operations and financial condition furnished by Lessee to Lessor at any time prior to or subsequent to the execution of this Master Lease is true and accurate in all material respects. If requested by Lessor, Lessee will provide for each Schedule an Incumbency Certificate or other document identifying the signatures and establishing the authority of the signers of the lease documents.

**20. NOTICES:** Any notices required by this Master Lease shall be transmitted by either registered or certified mail, return receipt requested, or overnight delivery or other form of expedited delivery which requires the signature or acknowledgement of the receiving party, or via facsimile provided that a successful transmission report is generated. All such notices shall be issued to the addresses of the parties set forth above, or to such other address as a party may hereafter specify by written notice given in accordance with the requirements of this Section, and shall be deemed effective on the earlier of the date received or three (3) days after the date notice is postmarked.

**21. SOFTWARE:** Lessee acknowledges that in the event the Equipment includes software, Lessee shall have no ownership or other proprietary rights to any such software and Lessee agrees to enter into such software license or other agreement for the use of such software as may be required by the owner or other authorized distributor of such software. Any software agreement shall be separate and distinct from this Master Lease and any Schedule, and Lessor shall not be obligated thereunder. The indemnification provisions of the above Section 7 shall apply to Lessee's unauthorized use of the software or other violation of any software agreement. To the extent not specifically set forth in any other section of this Master Lease, Lessor shall have the right to require Lessee to terminate Lessee's use of the Software if an Event of Default shall occur and shall be continuing hereunder.

**22. LESSOR'S RIGHT TO CURE:** If Lessee fails to perform any obligations hereunder, then Lessor, in addition to all of its rights and remedies hereunder, may perform the same, but shall not be obligated to do so, at the cost and expense of Lessee. In such event, Lessee shall promptly reimburse Lessor for any

administrative or other costs and expenses, including but not limited to attorneys' or other professional fees, incurred by Lessor, together with interest thereon at the Late Payment Rate from the date incurred to the date reimbursement is made. All payments and advances made by Lessor shall be deemed Rent.

**23. FINANCIAL STATEMENTS AND INFORMATION:** During the term of this Master Lease, Lessee shall furnish to Lessor within 90 days following the close of its fiscal year, Lessee's audited or unaudited (as the case may be) financial statement (including balance sheet and income statement), all prepared in accordance with generally accepted accounting principles consistently applied, and, from time to time, such other information concerning the Equipment as Lessor or its Assignee may reasonably request. In the event Lessee's financial statement is unaudited, then Lessee shall furnish a true copy of its Federal tax return within 10 days after the date such return has been filed.

**24. EXECUTION; COUNTERPARTS; FINANCING STATEMENT; POWER OF ATTORNEY; CORRECTIVE DOCUMENTS:**

**24.1** This Master Lease and any Schedule hereto may be executed in multiple counterparts, with each such counterpart constituting an original. Either party may execute this Master Lease and any Schedule hereto via facsimile or via electronic mail, in which event an original signature page shall promptly be forwarded to the other party, provided however that the failure to forward such original signature shall not relieve that party of any obligation thereunder.

**24.2** Lessee agrees that by its execution of this Master Lease, Lessor is authorized to file any UCC financing statements or related filings as Lessor may reasonably deem necessary to protect or perfect the interest of Lessor, its successors or assigns in this Master Lease, any Schedule, the payments due hereunder or the Equipment. Lessee agrees to execute such documents as may be required by applicable law in connection therewith. Lessee agrees that a copy of this Master Lease or any Schedule may be filed by Lessor as a financing statement. Lessee further agrees that if for any reason this Master Lease and/or any Schedule is determined to be other than a true lease under the UCC, Lessee hereby grants to Lessor a first priority security interest in the Equipment and all proceeds attributable thereto to secure payment of all sums due and to become due under this Master Lease and/or any Schedule, including without limitation, all Rent and Impositions. In the event that Lessee at any time purchases any Equipment from Lessor under any Schedule to this Master Lease, then in such event Lessee hereby grants to Lessor a perfected first priority security interest in all such Equipment and all proceeds attributable thereto to secure payment of all sums due and to become due from Lessee to Lessor on account of such purchase.

**24.3** Lessee hereby appoints Lessor or any Assignee as its agent and attorney-in-fact to execute, deliver, file and record any and all Uniform Commercial Code Financing Statements and Statements of Amendment as are deemed necessary by Lessor or any Assignee, regardless whether for precautionary filing purposes, to indicate the interest of Lessor or any Assignee in this Schedule, the Equipment and any proceeds thereof.

**24.4** Lessee and Lessor agree to cooperate with each other with respect to the execution of any documents which may reasonably be required to correct any errors or omissions in this Master Lease or any Schedule hereto.

**25. SUSPENSION OF OBLIGATIONS:** Prior to delivery of any Unit, the obligations of Lessor may be suspended to the extent that Lessor is hindered or prevented from complying therewith because of labor disturbances, acts of God, fire, storms, accidents, failure of the manufacturer to deliver any Unit, governmental regulations or interference, or any cause whatsoever not within the sole control of Lessor.

**26. SURVIVAL OF REPRESENTATIONS, WARRANTIES, INDEMNITIES AND COVENANTS:** All representations, warranties, indemnities and covenants of Lessee contained in this Master Lease or any other document or certificate delivered pursuant thereto shall continue in full force and effect and shall survive notwithstanding the full payment of all amounts due hereunder or the expiration or earlier termination of this Master Lease in any manner whatsoever, except to the extent any such representation or warranty by its nature expires upon the termination of the Master Lease.

**27. EFFECT OF WAIVER:** The failure or delay of Lessor in exercising any rights granted hereunder shall not constitute a waiver of any such right and any single or partial exercise of any particular right by Lessor shall not exhaust the same or constitute a waiver of any other right provided herein.

**28. WAIVER OF JURY TRIAL:** To the fullest extent permitted by applicable law, Lessee hereby waives Lessee's right to a trial by jury as to any cause of action arising out of or related to this Master Lease to which any such right attaches.

**29. GOVERNING LAW AND VENUE:** THIS MASTER LEASE SHALL HAVE THE EFFECT OF A CONTRACT ENTERED INTO WITHIN THE COMMONWEALTH OF MASSACHUSETTS AND SHALL BE CONSTRUED IN ACCORDANCE WITH, AND SHALL BE GOVERNED BY, THE LAWS OF MASSACHUSETTS. Any action which is commenced to enforce or interpret any provision of this Master Lease, or which otherwise in any manner relates hereto, shall be commenced only in a court of competent jurisdiction sitting within Massachusetts and Lessee hereby submits to the exclusive jurisdiction of such court. Notwithstanding the foregoing, and not in limitation thereof, Lessee agrees that Lessor shall have the right, in its sole discretion, to commence an action in any court of competent jurisdiction where any Equipment or other collateral securing Lessee's obligations hereunder is located, for purposes of obtaining any pre judgment security, or for purposes of recovering or obtaining possession of any such Equipment or other collateral.

**30. ENTIRE AGREEMENT; MODIFICATION; BINDING EFFECT:** There are no agreements or understandings, oral or written, between Lessor and Lessee with respect to the Equipment, other than as set forth in this Master Lease including any addenda or Schedule hereto. This Master Lease and each Schedule contain the entire agreement between Lessee and Lessor with respect to the subject matter hereof. Neither the Master Lease nor any Schedule may be altered, modified, terminated or discharged except by a writing signed by both Lessor and Lessee. This Master Lease and each Schedule shall be binding upon and shall inure to the benefit of Lessor, Lessee and their respective successors and assigns.

IN WITNESS WHEREOF, the parties have caused this Master Lease to be duly executed as set forth below.

**LESSOR:** NFS Leasing, Inc.

By: _____

Name:   Mark Blaisdell

Title:   Chief Financial Officer

Date:   5/4/2021

**LESSEE:** SA Hospital Acquisition Group, LLC

By: _____

Name: _____

Title: _____

Date: _____

**NFS Leasing**

April 26, 2021

LEASE AGREEMENT

Client Name: SA Hospital Acquisition Group, LLC

Client Address: 3933 S. Broadway
　　　　　　　　St. Louis, MO 63118

NFS Leasing, Inc. is pleased to provide the following lease proposal for your review:

| | |
|---|---|
| **LESSOR:** | **NFS Leasing, Inc.** |
| **LESSEE:** | **SA Hospital Acquisition Group, LLC** |
| **EQUIPMENT PROVIDER:** | **SA Hospital Acquisition Group, LLC (Sale-Leaseback)** |
| **TOTAL EQUIPMENT COST:** | **$6,688,439.15 Exclusive of Shipping & Tax.** |
| **ADVANCE PAYMENT(S):** | **First Month ($86,736.10), Tax on First Month ($8,395.19), Security Deposit ($86,736.10), and Origination Fee ($62,500.00) Less $5,000.00 already paid by to Lessor by Lessee Totaling $239,367.39 which shall be deducted from Funding to Lessee.** |
| **AMOUNT FINANCED:** | **$2,500,000.00 Exclusive of Shipping & Tax.** |
| **LEASE TERMS:** | **36 Monthly Lease Payments of $86,736.10 Plus Applicable Sales and Use and Property Tax.** |
| **CREDIT CONDITIONS:** | **Lessor receipt of All-Asset Lien (subject to mutually agreed upon carve outs and exceptions) on SA Hospital Acquisition Group, LLC in position acceptable to Lessor.**<br>**Execution of Personal Guaranty & Security Agreements by Jeffrey Ahlholm, Lawrence Feigen, and Benjamin Klein.**<br>**Lessor receipt of UCC3 Termination by Cardinal Health 110 LLC, As Agent.**<br>**Lessee Execution of Bill of Sale.**<br>**Lessor receipt of vendor invoicing, proof of payment, and serial numbers for the Leased Equipment from Lessee.**<br>**All associated legal expenses and filing fees will be passed through to Lessee.**<br>**Advance Payment made via wire transfer.**<br>**Monthly Payments made via Lessor initiated ACH.**<br>**Execution of a Tri-Party Landlord Agreement(s).** |
| **PAYMENT FREQUENCY:** | **Monthly in Advance** |
| **LEASE EXPIRATION OPTIONS:** | 1. **Purchase Equipment at Fair Market Value not to exceed $250,000.00 plus applicable tax.**<br>2. **Extend the Rent payments on a month-to-month basis or for a fixed term at a mutually agreed to price and term.**<br>3. **Return the Equipment.** |
| **DOCUMENTATION:** | **Master Lease Agreement (2021-0233), Schedule 1** |
| **PROPOSAL EXPIRATION:** | **4/30/2021** |

*Signatures on following page*

This is an offer to lease and is not binding upon either party until a master lease schedule is executed.

**LESSOR:** NFS Leasing, Inc.

By: _____

Name:  Mark Blaisdell

Title:  Chief Financial Officer

Date:  5/4/2021

**LESSEE:** SA Hospital Acquisition Group, LLC

By: _____

Name: _____

Title: _____

Date: _____

2

**SCHEDULE 1A**
EQUIPMENT LEASE SCHEDULE NO. 1
TO MASTER EQUIPMENT LEASE NO. 2021-0233
DATED AS OF 4/26/2021
BETWEEN NFS Leasing, Inc. ("LESSOR")
AND SA Hospital Acquisition Group, LLC ("LESSEE")

LESSEE:                                        EQUIPMENT LOCATION:

SA Hospital Acquisition Group, LLC             3933 S. Broadway
                                               St. Louis, MO 63118

EQUIPMENT DESCRIPTION:

| Vendor | Invoice or PO # | Description | Amount |
|---|---|---|---|
| Alco Sales And Service Co. | 2833897-IN | QTY 25 LITHIUM IRON PHOSPHATE BATTERY | $15,182.78 |
| BidMed, LLC | T-282-21 | PRECISION FLOUROSCOPY SYSTEM | $145,000.00 |
| BidMed, LLC | T-282-21 | SIGNA EXCITE 1.5T MOBILE MRI | $385,000.00 |
| Boelter | 720763-1 | CONTRACT TO FURNISH KITCHEN EQUIPMENT | $88,961.20 |
| Cadwell | 245921 | CAMERA ACCESSORIES | $3,390.30 |
| CDW 2 | 4049065 | MS SOFTWARE | $102,327.66 |
| CDW 3 | 3835877 | ARUBA SOFTWARE | $3,870.56 |
| CDW 4 | 3716877 | 48 WIRELESS GATEWAYS AND CONTROLLERS | $26,143.49 |
| CDW 5 | 4207989 | 100 7480 MONITORS 100 LOGITECH WIRELESS | $115,930.51 |
| CDW | 4171567 | 452 SOFTWARE LICENSES FOR MS EXCHANGE ETC. | $48,978.52 |
| FISHER HEALTHCARE | 5819729 | JPL430A HIGH PERFORMANCE PLASMA FREEZER | $6,689.30 |
| FUTURA MOBILITY | 100063518 | QTY 10 M38E CHASSIS POWER MLIFT AND ACCESORIES | $47,792.15 |
| FUTURA MOBILITY | 100063915 | 10 DELL OPTIPLEX MFF MLK | $7,851.00 |
| FUTURA MOBILITY | 100064007 | 10 HONEYWELL 1950 SCANNER ONLY | $3,466.64 |
| HILLROM | 1171078 | VOLARA SYSTEM AND STAND | $10,846.79 |
| JAKEN MEDICAL | 47560 | QTY 4 ELECTROCARDIOGRAPH GE MAC COLOR DISP 12SL GS INTERP | $12,399.30 |
| JUST MEDICAL | 4010584 | MRI SPIRODOC SPIROMETER AND OXIMETER | $1,575.00 |
| LINET -2 | 20202612 | BEDS MATTRESSES TABLES CHAIRS | $827,320.94 |
| MEDICAL POSITIONING | 5890 | ECHOTABLE AND ACCESSORIES | $8,002.70 |
| MINDRAY | P6001320A | QTY 4 MINDRAY ULTRASOUND SYSTEMS AND ACCESORIES | $321,606.00 |
| MINDRAY | P600011320 | MINDRAY PATIENT MONITORING AND ANESTHESIA SYSTEM | $1,010,905.43 |
| NORIX | INV88672 | BEDS MATTRESSES RESTRAINT CHAIRS LOUNGE | $42,029.18 |
| ORTHO CLINICAL DIAGNOSTICS | 1851665718 | VITRO XT 7600 INTEGRATED SYSTEM ANTIGEN TESTING | $239,828.60 |
| SERVICE EXPRESS | 987076 | EMC DELL INTEL VM WARE | $61,683.74 |
| STLCOM.COM 2 | 136089 | NURSE CALL SYSTEM AND PATIENT MONITORING | $570,238.63 |
| STLCOM.COM 3 | 136055 | TWO INVOICE INCLUDE SOFTWARE HARDWARE INSTALL AND TAX | $331,322.75 |
| STLCOM.COM 4 | STL.-135017 | AVAYA PHONE HARDWARE AND SYS SOFTWARE | $111,264.27 |
| ABBOT | 27314 | HEMATOLOGY ANALYZER | $38,200.00 |
| ADVANCED STRILIZATION PRODUCTS | 27474 | SURGERY STERILIZER - ST100NX ALLCLEAR 1-DR DUO and install kit | $120,000.00 |
| ARJO | 27482 | PATIENT LIFT AND SAFETY | $139,835.07 |

3

| | | | |
|---|---|---|---|
| COVIDIEN (Medtronic) | 27460 | QTY 4 VENTILATOR | **$136,000.00** |
| FERGUSON FACILITIES SUPPLIES | 27256 | QTY 2 EVS DEPARTMENTS | $62,715.02 |
| GE | 27499 | DICOM GW PRO | $5,567.52 |
| GE | 27390 | DIGITAL X RAY - Optima XR646 1D base LED (Item # S1204AH) | $32,500.00 |
| GE | 27360 | RADIOLOGY | $129,998.75 |
| GE | 27306 | CT SCAN - Revolution Evo Gen 2 ES Digital BJ | $88,375.00 |
| GE | 27442 | C-ARMS | $41,226.00 |
| GE | 27361 | NUCLEAR MEDICINE - GS INF2 .375IN ACQ SYS - GoldSeal Infinia II dual detector imaging system | $45,915.00 |
| GE | 27365 | ULTRASOUND - GoldSeal Logiq S8 R4.5 OLED (Catalog # L8029SE) and Array Probe | $35,760.00 |
| MCKESSON | 30429 | BIOMERIEUX (MICROBIOLOGY) | $20,591.14 |
| MCKESSON | 30426 | BIOMERIEUX MICROBIOLOGY) | $43,095.33 |
| PHILIPS | 27473 | QTY 4 BIPAP MACHINE | $59,903.68 |
| SIEMENS | 27328 | CO AG ANALYZER | $15,200.00 |
| STERIS | 27424 | QTY 2 SURGICAL TABLES | $139,174.79 |
| STERIS | 27424 | SURGICAL LIGHTS FOR 3 OR ROOMS | $11,294.48 |
| STRYKER | 27310 | NEPTUNE WASTE SYSTEM | $26,135.38 |
| STRYKER | 27462 | INSTRUMENTS | $28,595.94 |
| GE | POs 27360 & 27581 | Cath lab & Hemodynamics | $715,035.73 |
| FISHER HEALTHCARE | | Laxco Microscope System: LMC4BF w PL 10/50/100, Ergo Trinoc (Catalog # NC1881917) | $4,884.69 |
| FISHER HEALTHCARE | | Laxco Microscope System: LMC4BF w PL 4/10/20/100, Ergo Trinoc, Upgraded Stage (Catalog # NC1881919) | $4,374.15 |
| FISHER HEALTHCARE | Invoice # 4804846 | Ultra-Low Freezer: ULT FZ TSX40086A 115V/60HZ (Catalog # TSX40086A) | $15,855.35 |
| FISHER HEALTHCARE | | Laxco Microscope System: LMC3 W PL 4 PH 10/40 FULL GOUT (Catalog # NC1882294) | $2,598.69 |
| Philips Healthcare | PO # 27984 | 102503 IntraSight (NNAW511 - IntraSight 7) | $176,000.00 |
| | | | |
| | | | |
| | | **Total Original Equipment Cost:** | **$6,688,439.15** |

Original Equipment Cost: $6,688,439.15 Exclusive of Shipping & Tax.

Amount Financed: $2,500,000.00 Exclusive of Shipping & Tax.

Monthly Payment: $86,736.10 Plus Applicable Sales and Use and Property Tax.

Initial Term: 36 months

Advance Payment: First Month, Tax on First Month, Security Deposit, & Origination Fee less $5,000.00 already paid to Lessor by Lessee = $239,367.39 which shall be deducted from Funding to Lessee.

*Signatures on next page*

4

The terms and conditions of the Master Lease are hereby incorporated and made a part hereof as if such terms and conditions were fully set forth herein.

**LESSOR:** NFS Leasing, Inc.

By: _____

Name:  Mark Blaisdell

Title:  Chief Financial Officer

Date: _____5/4/2021_____

**LESSEE:** SA Hospital Acquisition Group, LLC

By: _____

Name: _____

Title: _____

Date: _____

5

**SCHEDULE 1B**
EQUIPMENT LEASE SCHEDULE NO. 1
TO MASTER EQUIPMENT LEASE NO. 2021-0233
DATED AS OF 4/26/2021
BETWEEN NFS Leasing, Inc. ("LESSOR")
AND SA Hospital Acquisition Group, LLC ("LESSEE")

| LESSEE: | EQUIPMENT LOCATION: |
|---|---|
| SA Hospital Acquisition Group, LLC | 3933 S. Broadway |
| | St. Louis, MO 63118 |

Pursuant to the above referenced Schedule and Lease, Lessor offers the following End of Lease Purchase Options to Lessee:

Upon payment of final Rent Payment, Lessee will have the option to:

1. Purchase Equipment at Fair Market Value not to exceed $250,000.00 plus applicable tax.
2. Extend the Rent payments on a month-to-month basis or for a fixed term at a mutually agreed to price and term.
3. Return the Equipment.

The terms and conditions of the Master Lease are hereby incorporated and made a part hereof as if such terms and conditions were fully set forth herein.

**LESSOR:** NFS Leasing, Inc.

By: _____

Name:  Mark Blaisdell

Title:  Chief Financial Officer

Date:  5/4/2021

**LESSEE:** SA Hospital Acquisition Group, LLC

By: _____

Name: _____

Title: _____

Date:  4/3/21

6

**SCHEDULE 1C**

EQUIPMENT LEASE SCHEDULE NO. 1

TO MASTER EQUIPMENT LEASE NO. 2021-0233

DATED AS OF 4/26/2021

BETWEEN NFS Leasing, Inc. ("LESSOR")

AND SA Hospital Acquisition Group, LLC ("LESSEE")

LESSEE:                                      EQUIPMENT LOCATION:

SA Hospital Acquisition Group, LLC      3933 S. Broadway
                                         St. Louis, MO 63118

Pursuant to the above referenced Schedule and Master Lease, Lessee by its below signature, hereby certifies that the Units of Equipment described in the Schedule and below have been delivered by the Supplier of such Equipment at the location of Lessee described herein, have been inspected by authorized representatives of Lessee, have been found to be in good repair, condition and working order and are accepted by Lessee as Equipment under the Schedule on the date set forth below:

EQUIPMENT DESCRIPTION:

| Vendor | Invoice or PO # | Description | Amount |
|---|---|---|---|
| Alco Sales And Service Co. | 2833897-IN | QTY 25 LITHIUM IRON PHOSPHATE BATTERY | $15,182.78 |
| BidMed, LLC | T-282-21 | PRECISION FLOUROSCOPY SYSTEM | $145,000.00 |
| BidMed, LLC | T-282-21 | SIGNA EXCITE 1.5T MOBILE MRI | $385,000.00 |
| Boelter | 720763-1 | CONTRACT TO FURNISH KITCHEN EQUIPMENT | $88,961.20 |
| Cadwell | 245921 | CAMERA ACCESSORIES | $3,390.30 |
| CDW 2 | 4049065 | MS SOFTWARE | $102,327.66 |
| CDW 3 | 3835877 | ARUBA SOFTWARE | $3,870.56 |
| CDW 4 | 3716877 | 48 WIRELESS GATEWAYS AND CONTROLLERS | $26,143.49 |
| CDW 5 | 4207989 | 100 7480 MONITORS 100 LOGITECH WIRELESS | $115,930.51 |
| CDW | 4171567 | 452 SOFTWARE LICENSES FOR MS EXCHANGE ETC. | $48,978.52 |
| FISHER HEALTHCARE | 5819729 | JPL430A HIGH PERFORMANCE PLASMA FREEZER | $6,689.30 |
| FUTURA MOBILITY | 100063518 | QTY 10 M38E CHASSIS POWER MLIFT AND ACCESORIES | $47,792.15 |
| FUTURA MOBILITY | 100063915 | 10 DELL OPTIPLEX MFF MLK | $7,851.00 |
| FUTURA MOBILITY | 100064007 | 10 HONEYWELL 1950 SCANNER ONLY | $3,466.64 |
| HILLROM | 1171078 | VOLARA SYSTEM AND STAND | $10,846.79 |
| JAKEN MEDICAL | 47560 | QTY 4 ELECTROCARDIOGRAPH GE MAC COLOR DISP 12SL GS INTERP | $12,399.30 |
| JUST MEDICAL | 4010584 | MRI SPIRODOC SPIROMETER AND OXIMETER | $1,575.00 |
| LINET -2 | 20202612 | BEDS MATTRESSES TABLES CHAIRS | $827,320.94 |
| MEDICAL POSITIONING | 5890 | ECHOTABLE AND ACCESSORIES | $8,002.70 |
| MINDRAY | P6001320A | QTY 4 MINDRAY ULTRASOUND SYSTEMS AND ACCESORIES | $321,606.00 |
| MINDRAY | P600011320 | MINDRAY PATIENT MONITORING AND ANESTHESIA SYSTEM | $1,010,905.43 |
| NORIX | INV88672 | BEDS MATTRESSES RESTRAINT CHAIRS LOUNGE | $42,029.18 |
| ORTHO CLINICAL DIAGNOSTICS | 1851665718 | VITRO XT 7600 INTEGRATED SYSTEM ANTIGEN TESTING | $239,828.60 |
| SERVICE EXPRESS | 987076 | EMC DELL INTEL VM WARE | $61,683.74 |
| STLCOM.COM 2 | 136089 | NURSE CALL SYSTEM AND PATIENT MONITORING | $570,238.63 |
| STLCOM.COM 3 | 136055 | TWO INVOICE INCLUDE SOFTWARE HARDWARE INSTALL AND TAX | $331,322.75 |

7

| | STL-135017 | | |
|---|---|---|---|
| STLCOM.COM 4 | STL-135017 | AVAYA PHONE HARDWARE AND SYS SOFTWARE | $111,264.27 |
| ABBOT | 27314 | HEMATOLOGY ANALYZER | $38,200.00 |
| ADVANCED STRILIZATION PRODUCTS | 27474 | SURGERY STERILIZER - ST100NX ALLCLEAR 1-DR DUO and install kit | $120,000.00 |
| ARJO | 27482 | PATIENT LIFT AND SAFETY | $139,835.07 |
| COVIDIEN (Medtronic) | 27460 | QTY 4 VENTILATOR | $136,000.00 |
| FERGUSON FACILITIES SUPPLIES | 27256 | QTY 2 EVS DEPARTMENTS | $62,715.02 |
| GE | 27499 | DICOM GW PRO | $5,567.52 |
| GE | 27390 | DIGITAL X RAY - Optima XR646 1D base LED (Item # S1204AH) | $32,500.00 |
| GE | 27360 | RADIOLOGY | $129,998.75 |
| GE | 27306 | CT SCAN - Revolution Evo Gen 2 ES Digital BJ | $88,375.00 |
| GE | 27442 | C-ARMS | $41,226.00 |
| GE | 27361 | NUCLEAR MEDICINE - GS INF2 .375IN ACQ SYS - GoldSeal Infinia II dual detector imaging system | $45,915.00 |
| GE | 27365 | ULTRASOUND - GoldSeal Logiq S8 R4.5 OLED (Catalog # L8029SE) and Array Probe | $35,760.00 |
| MCKESSON | 30429 | BIOMERIEUX (MICROBIOLOGY) | $20,591.14 |
| MCKESSON | 30426 | BIOMERIEUX MICROBIOLOGY) | $43,095.33 |
| PHILIPS | 27473 | QTY 4 BIPAP MACHINE | $59,903.68 |
| SIEMENS | 27328 | CO AG ANALYZER | $15,200.00 |
| STERIS | 27424 | QTY 2 SURGICAL TABLES | $139,174.79 |
| STERIS | 27424 | SURGICAL LIGHTS FOR 3 OR ROOMS | $11,294.48 |
| STRYKER | 27310 | NEPTUNE WASTE SYSTEM | $26,135.38 |
| STRYKER | 27462 | INSTRUMENTS | $28,595.94 |
| GE | POs 27360 & 27581 | Cath lab & Hemodynamics | $715,035.73 |
| FISHER HEALTHCARE | | Laxco Microscope System: LMC4BF w PL 10/50/100, Ergo Trinoc (Catalog # NC1881917) | $4,884.69 |
| FISHER HEALTHCARE | | Laxco Microscope System: LMC4BF w PL 4/10/20/100, Ergo Trinoc, Upgraded Stage (Catalog # NC1881919) | $4,374.15 |
| FISHER HEALTHCARE | Invoice # 4804846 | Ultra-Low Freezer: ULT FZ TSX40086A 115V/60HZ (Catalog # TSX40086A) | $15,855.35 |
| FISHER HEALTHCARE | | Laxco Microscope System: LMC3 W PL 4 PH 10/40 FULL GOUT (Catalog # NC1882294) | $2,598.69 |
| Philips Healthcare | PO # 27984 | 102503 IntraSight (NNAW511 - IntraSight 7) | $176,000.00 |
| | | | |
| | | **Total Original Equipment Cost:** | **$6,688,439.15** |

The terms and conditions of the Master Lease are hereby incorporated and made a part hereof as if such terms and conditions were fully set forth herein.

**LESSEE: SA Hospital** Acquisition Group, LLC

By: _____

Name: _____

Title: _____

Date: _____

8

# EXHIBIT 2

Exhibit B
Fair Market Valuation

| DESCRIPTION | SERIAL NUMBER | VENDOR | INVOICE/PO NUMBER | ORIGINAL COST | ESTIMATED VALUE |
|---|---|---|---|---|---|
| CD Ruby Analyzer & CD Ruby UPS | 71571BG | Abbott | 27314 | 37,400 | 5,610 |
| ST100NX ALLCLEAR 1-DR DUO | 1047201602 | Advanced Strilization Products | 27474 | 120,000 | 70,000 |
| Lithium Ion Batteries | | ALCO Sales & Service | 2833897-IN | 15,182.78 | 2,277.41 |
| Patient Lift and Safety | | ARJO | 27482 | 139,835.07 | 20,975.26 |
| Precision 500D Flouroscopy System | | BidMed, LLC | T-282-21 | 145,000 | 70,000 |
| Signa Excite 1.5T Mobile MRI | | BidMed, LLC | T-282-21 | 385,000 | 175,000 |
| DISHWASHER, CONVEYOR TYPE | | Boelter | 720763-1 | | |
| CLEAN DISHTABLE | | Boelter | 720763-1 | | |
| REACH-IN REFRIDGERATOR | | Boelter | 720763-1 | | |
| HOT FOOD SERVING COUNTER/TABLE | | Boelter | 720763-1 | 88,961.20 | 13,344.18 |
| HOT FOOD SERVING COUNTER/TABLE | | Boelter | 720763-1 | | |
| HEATED HOLDING/TRANSPORT INSTITUTIONAL CABINET | | Boelter | 720763-1 | | |
| Camera, Pan-Tilt-Zoom, Ful HD | TDV05620 | Cadwell | 27396 | | |
| Kit, Mounting, Bracket, Camera & IR | | Cadwell | 27396 | 3,390.30 | 508.54 |
| PoE Supply, Dual Port, 60W | | Cadwell | 27396 | | |
| (100) Dell CTO 7480 Monitors & (100) Logitech MK540 WRLS Keyboard/Mouse combo | | CDW | 4207989 | 115,930.51 | 17,389.58 |
| ARUBA 7030 64 AP BRANCH CNTLR | CR0025448 | CDW-G | 3716877 | | |
| ARUBA 7030 64 AP BRANCH CNTLR | CR0025591 | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55CN | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55KJ | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55LB | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55L4 | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55MB | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55MN | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55MS | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55MT | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55MY | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55M5 | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55M8 | CDW-G | 3716877 | 26,143.49 | 3,921.52 |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55M9 | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55NC | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKWKD55P4 | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD52PM | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD52PT | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD52PW | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD52PX | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD52P1 | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD526G | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD526J | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD526K | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD526O | CDW-G | 3716877 | | |
| ARUBA AP-515 (US) UNIFIED AP | PHKXKD5265 | CDW-G | 3716877 | | |
| Puritan Bennett 980 Ventilator | 3SC2007291 | Covidien Sales | 27460 | | |
| Puritan Bennett 980 Ventilator | 3SC2007379 | Covidien Sales | 27460 | 136,000 | 20,400 |
| Puritan Bennett 980 Ventilator | (21) 35B2012376 | Covidien Sales | 27460 | | |
| Puritan Bennett 980 Ventilator | (21) 35B2012248 | Covidien Sales | 27460 | | |

Exhibit B
Fair Market Valuation

| DESCRIPTION | SERIAL NUMBER | VENDOR | INVOICE/PO NUMBER | ORIGINAL COST | ESTIMATED VALUE |
|---|---|---|---|---|---|
| HYGEN HI SCURTY CLEANING CART BLAC | | Ferguson Facilities Supply | 0219805 | | |
| HYGEN HI SCURTY CLEANING CART BLAC | | Ferguson Facilities Supply | 0219805 | | |
| TASKPRO 20 HD FLR MACH 1.5HP W/ PAD | | Ferguson Facilities Supply | 0219805 | 2,272.10 | 340.82 |
| TASKPRO 20 HD FLR MACH 1.5HP W/ PAD | | Ferguson Facilities Supply | 0219805 | | |
| HYGEN HI SCURTY CLEANING CART BLAC | | Ferguson Facilities Supply | 0219805-1 | | |
| HYGEN HI SCURTY CLEANING CART BLAC | | Ferguson Facilities Supply | 0219805-1 | | |
| HYGEN HI SCURTY CLEANING CART BLAC | | Ferguson Facilities Supply | 0219805-1 | | |
| HYGEN HI SCURTY CLEANING CART BLAC | | Ferguson Facilities Supply | 0219805-1 | 2,864.10 | 429.62 |
| HYGEN HI SCURTY CLEANING CART BLAC | | Ferguson Facilities Supply | 0219805-1 | | |
| HYGEN HI SCURTY CLEANING CART BLAC | | Ferguson Facilities Supply | 0219805-1 | | |
| BD 50/50 C CLASSIC BP W/ AGM BTRY | | Ferguson Facilities Supply | 0220048 | 6,232.66 | 934.9 |
| BD 50/50 C CLASSIC BP W/ AGM BTRY | | Ferguson Facilities Supply | 0220048-1 | | |
| LIGHTNING 2000 BURNISHER | | Ferguson Facilities Supply | 0220048-1 | | |
| LIGHTNING 2000 BURNISHER | | Ferguson Facilities Supply | 0220048-1 | | |
| COMM UP VAC CV 380 | | Ferguson Facilities Supply | 0220048-1 | 10,655.97 | 1,598.40 |
| COMM UP VAC CV 380 | | Ferguson Facilities Supply | 0220048-1 | | |
| AIRMOVER 3 PORTBL AIR BLWR W/ HDL | | Ferguson Facilities Supply | 0220048-1 | | |
| AIRMOVER 3 PORTBL AIR BLWR W/ HDL | | Ferguson Facilities Supply | 0220048-1 | | |
| B 90 R ADV BP D RIDER SCRUB W/AGM | | Ferguson Facilities Supply | 0220048-2 | | |
| Lightning BDP 50/2000 AGM Battery B | | Ferguson Facilities Supply | 0220048-2 | | |
| Karcher NT68/1 Wet/Dry Vac 18gl w/s | | Ferguson Facilities Supply | 0220048-2 | | |
| Karcher NT68/1 Wet/Dry Vac 18gl w/s | | Ferguson Facilities Supply | 0220048-2 | 26,147.97 | 3,922.20 |
| CLIPPER 12 115V CARPET EXTR | | Ferguson Facilities Supply | 0220048-2 | | |
| Windsor Chariot 2 iGloss w/3-234AH | | Ferguson Facilities Supply | 0220048-2 | 11,443.91 | 1,716.59 |
| JPL430A High Performance Plasma Freezer | 1.16191E+15 | Fisher Healthcare | 5819729 | 6,689.30 | 1003.39 |
| LMC4BF W PL 10/50/100 ERGO TR | | Fisher Healthcare | 0301-9526-27 | 4,884.69 | 732.7 |
| LMC4BF w PL 4/10/20/100, ERGO | C0421-599-0011 | Fisher Healthcare | 0301-9526-42 | 4,374.15 | 656.12 |
| LMC3 W PL 4 PH 10/40 FULL GOUT | | Fisher Healthcare | 0301-9531-42 | 2,832.91 | 424.36 |
| ULT FZ TSX40086A 115V/60HZ | 1.11548E+15 | Fisher Healthcare | 4804846 | 15,855.35 | 2,378.35 |
| Dell OptiPlex 5070 MFF MLK | BRX0773 | Futura Mobility | 100063915 | | |
| Dell OptiPlex 5070 MFF MLK | BRX1773 | Futura Mobility | 100063915 | | |
| Dell OptiPlex 5070 MFF MLK | BRX2673 | Futura Mobility | 100063915 | | |
| Dell OptiPlex 5070 MFF MLK | BRX2773 | Futura Mobility | 100063915 | | |
| Dell OptiPlex 5070 MFF MLK | BRX3773 | Futura Mobility | 100063915 | | |
| Dell OptiPlex 5070 MFF MLK | BRX4773 | Futura Mobility | 100063915 | 7,851 | 1,177.65 |
| Dell OptiPlex 5070 MFF MLK | BRX5773 | Futura Mobility | 100063915 | | |
| Dell OptiPlex 5070 MFF MLK | BRX6773 | Futura Mobility | 100063915 | | |
| Dell OptiPlex 5070 MFF MLK | BRX7773 | Futura Mobility | 100063915 | | |
| Dell OptiPlex 5070 MFF MLK | BRX8773 | Futura Mobility | 100063915 | | |
| Honeywell 1950 scanner only, corded, HD | 20315B18D3 | Futura Mobility | 100064007 | | |
| Honeywell 1950 scanner only, corded, HD | 20315B2164 | Futura Mobility | 100064007 | | |
| Honeywell 1950 scanner only, corded, HD | 20315B21CB | Futura Mobility | 100064007 | | |
| Honeywell 1950 scanner only, corded, HD | 20315B2240 | Futura Mobility | 100064007 | | |
| Honeywell 1950 scanner only, corded, HD | 20315B225E | Futura Mobility | 100064007 | 3,466.64 | 520 |
| Honeywell 1950 scanner only, corded, HD | 20315B2284 | Futura Mobility | 100064007 | | |
| Honeywell 1950 scanner only, corded, HD | 20315B22EB | Futura Mobility | 100064007 | | |

Exhibit B
Fair Market Valuation

| DESCRIPTION | SERIAL NUMBER | VENDOR | INVOICE/PO NUMBER | ORIGINAL COST | ESTIMATED VALUE |
|---|---|---|---|---|---|
| Honeywell 1950 scanner only, corded, HD | 20315B232D | Futura Mobility | 100064007 | | |
| Honeywell 1950 scanner only, corded, HD | 20315B2342 | Futura Mobility | 100064007 | | |
| Honeywell 1950 scanner only, corded, HD | 20315B248D | Futura Mobility | 100064007 | | |
| M38e Chassis-Power Mlift-NoELock | 20-015895-M38E | Futura Mobility | 100063518 | | |
| M38e Chassis-Power Mlift-NoELock | 20-015896-M38E | Futura Mobility | 100063518 | | |
| M38e Chassis-Power Mlift-NoELock | 20-015897-M38E | Futura Mobility | 100063518 | | |
| M38e Chassis-Power Mlift-NoELock | 20-015898-M38E | Futura Mobility | 100063518 | | |
| M38e Chassis-Power Mlift-NoELock | 20-015899-M38E | Futura Mobility | 100063518 | 47,792.15 | 7,168.82 |
| M38e Chassis-Power Mlift-NoELock | 20-015900-M38E | Futura Mobility | 100063518 | | |
| M38e Chassis-Power Mlift-NoELock | 20-015901-M38E | Futura Mobility | 100063518 | | |
| M38e Chassis-Power Mlift-NoELock | 20-015902-M38E | Futura Mobility | 100063518 | | |
| M38e Chassis-Power Mlift-NoELock | 20-015903-M38E | Futura Mobility | 100063518 | | |
| M38e Chassis-Power Mlift-NoELock | 20-015904-M38E | Futura Mobility | 100063518 | | |
| Hemodynamic Monitoring System | | GE | 27581 | 129,998.75 | 65,000.00 |
| Dicom GW Pro | STJ21085518TA | GE | 27499 | 5,567.52 | 835.12 |
| C-ARM SYSTEM | 86-0620 | GE | 27442 | 41,226.00 | 6,183.90 |
| GS INF2 .37SIN ACQ SYS | | GE | 27361 | 45,915.18 | 6,887.27 |
| Optima XR646 1D base LED Digital X-Ray | | GE | 27390 | 32,500 | 4,875 |
| GS Logiq S8 R4.5 OLED Ultrasound | 5052270SU2 | GE | 27365 | 35,760 | 5,364 |
| Revolution Evo Gen 2 ES Digital BJ CT Scan | 14447778 | GE | 27306 | 88,375 | 40,000 |
| Cath Lab and Hemodynamics | | GE | 27360* | 715,035.73 | 375,000.00 |
| Volara System and Stand | | Hillrom | 1171078 | 10,846.79 | 1,627.01 |
| ELECTROCARDIOGRAPH, GE, MAC 5500 HD, COLOR DISPLAY, CAM 14, 12SL GS INTERP | SKJ13216815PA | Jaken Medical, Inc. | 47560 | | |
| ELECTROCARDIOGRAPH, GE, MAC 5500 HD, COLOR DISPLAY, CAM 14, 12SL GS INTERP | SKJ14130930PA | Jaken Medical, Inc. | 47560 | 12,399.30 | 1,859.90 |
| ELECTROCARDIOGRAPH, GE, MAC 5500 HD, COLOR DISPLAY, CAM 14, 12SL GS INTERP | SKJ16078940PA | Jaken Medical, Inc. | 47560 | | |
| ELECTROCARDIOGRAPH, GE, MAC 5500 HD, COLOR DISPLAY, CAM 14, 12SL GS INTERP | SKJ13461184SA | Jaken Medical, Inc. | 47560 | | |
| MIR Spirodoc Spirometer + Oximeter | A23-OW-09382 | Just Medical | 4010584 | 1,575.00 | 236.25 |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115530 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115532 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115533 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115534 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115535 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115536 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115537 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115538 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115539 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115540 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115541 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115542 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115543 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115544 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115545 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115546 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115547 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115548 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115549 | LINET Americas, Inc. | 20202612 | | |

Exhibit B
Fair Market Valuation

| DESCRIPTION | SERIAL NUMBER | VENDOR | INVOICE/PO NUMBER | ORIGINAL COST | ESTIMATED VALUE |
|---|---|---|---|---|---|
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115551 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115552 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115553 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115554 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115555 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115556 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210115557 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210136627 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 4, Standard with EMR Comm Module and m-Panel Ready | 20210136628 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111718 | LINET Americas, Inc. | 20202612 | 827,320.94 | 124,098.14 |
| Eleganza 5, Advanced with EMR Comm Module | 20210111719 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111720 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111721 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111722 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111723 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111724 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111725 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111726 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111727 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111728 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111729 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111730 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111731 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111732 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111733 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111734 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111735 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111736 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111737 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111738 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111739 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111740 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111741 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111742 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111743 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111744 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111745 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111746 | LINET Americas, Inc. | 20202612 | | |
| Eleganza 5, Advanced with EMR Comm Module | 20210111747 | LINET Americas, Inc. | 20202612 | | |
| Biomerieux (Microbiology) | | McKesson | 30429* | 20,591.14 | 3,088.67 |
| Biomerieux (Microbiology) | | McKesson | 30426* | 43,095.33 | 6,464.30 |
| ECHOTABLE, HF, 2D & Accessories | #REF! | Medical Positioning | 5890 | 8,002.70 | 1,200.40 |
| Ultrasound Machine | 7V-98001645 | Mindray DS USA | P6001320A | | |
| Ultrasound Machine | 7V-97001610 | Mindray DS USA | P6001320A | 321,606 | 85,000 |
| Ultrasound Machine | 7S-08005993 | Mindray DS USA | P6001320A | | |
| Ultrasound Machine | 7S-08006002 | Mindray DS USA | P6001320A | | |

Exhibit B
Fair Market Valuation

| DESCRIPTION | SERIAL NUMBER | VENDOR | INVOICE/PO NUMBER | ORIGINAL COST | ESTIMATED VALUE |
|---|---|---|---|---|---|
| Mindray Patient Monitoring & Anesthesia System | | Mindray DS USA | P6001320A | 1,010,905.43 | 400,000 |
| Attenda, Beds, Platform Bed, Attenda Platform Bed with No Mounting Holes, Pine Cone (QTY 6) | | Norix Group Inc. | INV88672 | 42,029.18 | 6,304.37 |
| Attenda, Beds, Platform Bed, AttendaPlatform Bed, Pine Cone (QTY 1) | | Norix Group Inc. | INV88672 | | |
| Attenda, Restraint Rings, Attenda Removable Restraint Ring - Set of 6 (QTY 1) | | Norix Group Inc. | INV88672 | | |
| Comfort Shield, Comfort Shield Remedy - Sealed Seam Mattress, MRB6, 38" x 82" x 6" (QTY 32) | | Norix Group Inc. | INV88672 | | |
| Comfort Shield, Comfort Shield Remedy - Sealed Seam Mattress, PRB (QTY 35) | | Norix Group Inc. | INV88672 | | |
| Vesta, Vesta Guest Armless Chair, Pine Cone (QTY 8) | | Norix Group Inc. | INV88672 | | |
| Harmony, Square Back High Back Chair, Back Fabric, CF Stinson, Rally-Dusty Jade, #RAL46, Short Apron Clean Out, Seat Fabric, CF Stinson, Rally-Dusty Jade, #RAL46, Black, Arm Fabric, CF Stinson, Rally-Dusty Jade, #RAL46 (QTY 8) | | Norix Group Inc. | INV88672 | | |
| Harmony, Square Back Lounge Chair, Back Fabric, CF Stinson, Rally-Dusty Jade, #RAL46, Short Apron Clean Out, Seat Fabric, CF Stinson, Rally-Dusty Jade, #RAL46, Black, Arm Fabric, CF Stinson, Rally-Dusty Jade, #RAL46 (QTY 8) | | Norix Group Inc. | INV88672 | | |
| Vitro XT 7600 Integrated System Antigen Testing | | Ortho Clinical Diagnostics | 1851665718 | 239,828.60 | 35,974.29 |
| V60 Plus US Trspt Cfg, CktArm O2Man Assm | 100413567 | Philips Healthcare | 27473 | 59,903.68 | 8,985.55 |
| V60 Plus US Trspt Cfg, CktArm O2Man Assm | 100413829 | Philips Healthcare | 27473 | | |
| V60 Plus US Trspt Cfg, CktArm O2Man Assm | 100413576 | Philips Healthcare | 27473 | | |
| V60 Plus US Trspt Cfg, CktArm O2Man Assm | 100413914 | Philips Healthcare | 27473 | | |
| 102503 IntraSight 7 | | Philips Healthcare | 27984 | 176,000 | 115,000 |
| CA-620 Instrument | 24607 | Siemens | 27328 | 15,200 | 2,280 |
| 4095 Surgical Table | 0434220013 | Steris | 27424 | 11,294.48 | 1,694.17 |
| Operating Room Lights | | Steris | 27424 | | |
| 4095 Surgical Table | 0434220013 | Steris | 27424 | 139,174.79 | 85,000 |
| 4095 Surgical Table | 0434220015 | Steris | 27424 | | |
| Contract NC2011-2339 (Phone System) | | STL Communications | 136055 | 331,322.75 | |
| Contract NC2011-2339 (Phone System) | | STL Communications | 136089 | 570,238.63 | 300,000.00 |
| AVAYA IP Office phone system | | STL Communications | STL-135017 | 111,264.27 | |
| FG, CINCHLOCK SS DRILL GUIDE (QTY 2) | | Stryker Endoscopy | 27462 | 28,595.94 | 4,289.94 |
| BIG DOG SUTURE CUTTER (QTY 2) | | Stryker Endoscopy | 27462 | | |
| PKG.,3.4 HOOK SCISSORS STRAIGHT (QTY 2) | | Stryker Endoscopy | 27462 | | |
| 3.4 MM SOFT TISSUE GRASPER, NO RATCHET (QTY 2) | | Stryker Endoscopy | 27462 | | |
| PACKAGING, SUTURE MANIPULATER (QTY 2) | | Stryker Endoscopy | 27462 | | |
| PACKAGING, PENETRATING GRASPER RIGHT (QTY 2) | | Stryker Endoscopy | 27462 | | |
| PACKAGING, PENETRATING GRASPER LEFT (QTY 2) | | Stryker Endoscopy | 27462 | | |
| PACKAGING, PENETRATING GRASPER 30 DEG (QTY 2) | | Stryker Endoscopy | 27462 | | |
| PACKAGING, SUTURE GRASPER (QTY 2) | | Stryker Endoscopy | 27462 | | |
| 120V Neptune 3 Rover | 2023308313 | Stryker Sales | 27310 | 26,135.38 | 3,920.30 |
| Nept 2 Docking Station | 2030339453 | Stryker Sales | 27310 | | |
| | | | | | |
| TOTAL | | | | 6,467,915 | 2,113,599 |

*Purchase order and equipment description subject to change because equipment had not been delivered and installed at time of transaction.

# EXHIBIT 3

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| (978) 338-4810 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| UCC@NFSLEASING.COM |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

NFS LEASING, INC.

900 CUMMINGS CENTER

SUITE 226-U

BEVERLY, MA 01915

**Delaware Department of State**
**U.C.C. Filing Section**
**Filed: 12:00 PM 03/26/2021**
**U.C.C. Initial Filing No: 2021 2390012**

**Service Request No:  20211057473**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | SA HOSPITIAL ACQUISITION GROUP, LLC | | | |
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 16192 COASTAL HIGHWAY | LEWES | DE | 19958 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | | | | |
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|---|
| | NFS LEASING, INC. | | | |
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 900 CUMMINGS CENTER, SUITE 226-U | BEVERLY | MA | 01915 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All equipment, peripherals and any and all inventory (collectively "Equipment") wherever located, financed under and described in the Schedule 1 to Master Lease Agreement 2021-0233 (the "Lease") entered into between Lessee and Lessor and all of Lessor's rights, title and interest in and to use any software and services (collectively "Software") financed under and described in the Lease, along with any modifications or supplements to the Lease which are incorporated or evidenced in writing and all substitutions, additions, accessions and replacements to the Equipment or Software now or hereafter installed in, affixed to, or used in conjunction with the Equipment or Software and the proceeds thereof together with all payments, insurance proceeds, credits or refunds obtained by Lessee from a manufacturer, licensor or service provider, or other proceeds and payments due and to become due and arising from or relating to such Equipment, Software or the Lease. In the event Lessee purchases any such Equipment or Software, then Lessee, in accordance with the provisions of the Lease, hereby grants to Lessor a first priority security interest in any such Equipment or Software purchased until such time as Lessor receives payment of the full purchase price from Lessee.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative |
|---|

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

| 7. ALTERNATIVE DESIGNATION (if applicable): | ☑ Lessee/Lessor | ☐ Consignee/Consignor | ☐ Seller/Buyer | ☐ Bailee/Bailor | ☐ Licensee/Licensor |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA:
SA HOSPITAL 1

International Association of Commercial Administrators

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# UCC FINANCING STATEMENT **ADDITIONAL PARTY**

FOLLOW INSTRUCTIONS

**18. NAME OF FIRST DEBTOR:** Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| 18a. ORGANIZATION'S NAME |
|---|
| SA HOSPITIAL ACQUISITION GROUP, LLC |

OR

| 18b. INDIVIDUAL'S SURNAME |
|---|
| FIRST PERSONAL NAME |

| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**19. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (19a or 19b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name)

| 19a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 19c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**20. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (20a or 20b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name)

| 20a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**21. ADDITIONAL DEBTOR'S NAME:** Provide only one Debtor name (21a or 21b) (use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name)

| 21a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**22.** ☑ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (22a or 22b)

| 22a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| PEOPLE'S UNITED BANK | | | |
| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 22c. MAILING ADDRESS<br>ONE POST OFFICE SQUARE, 32ND FLOOR | CITY<br>BOSTON | STATE<br>MA | POSTAL CODE<br>02109 | COUNTRY<br>US |

**23.** ☐ **ADDITIONAL SECURED PARTY'S NAME** or ☐ **ASSIGNOR SECURED PARTY'S NAME:** Provide only one name (23a or 23b)

| 23a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

**24. MISCELLANEOUS:**

# EXHIBIT 4



# SECURITY AGREEMENT

April 26, 2021

In order to secure the due and punctual payment of all of the Obligations (as herein defined), by acceleration or otherwise SA Hospital Acquisition Group, LLC, a Delaware limited liability company, having its chief executive office at 3933 South Broadway, St. Louis, MO 63118 ("Debtor"), hereby grants to NFS Leasing, Inc., a Massachusetts Corporation ("Secured Party"), having an address of 900 Cummings Center, Suite 226-U, Beverly, MA 01915, a continuing security interest in the following item(s) of collateral:

All of Debtor's now owned and hereafter acquired howsoever arising which are or may be subject to Article 9 of the Uniform Commercial Code, together with all replacements therefor, additions and accessions thereto, and proceeds (including, but without limitation, insurance proceeds) and products thereof, including the following:; Equipment  All existing and future leases and use agreements of such Equipment entered into by Debtor as lessor with other Persons as lessees, including without limitation the right to receive and collect all rentals and other monies, including security deposits, at any time payable under such leases and agreements; Any existing and future leases and use agreements of Equipment entered into by Debtor as lessee with other Persons as lessors, including, without limitation, the leasehold interest of Debtor in such property, and all options to purchase such property or to extend any such lease or agreement; All Records pertaining to any of the Collateral; and All interest, dividends, Proceeds and proceeds of proceeds, products, rents, royalties, issues and profits of any of the property described above, including, without limitation, all monies due and to become due with respect to such property, together with all rights to receive the same, and all notes, certificates of deposit, checks and other instruments and property from time to time delivered to or otherwise possessed by Secured Party for or on behalf of Debtor in substitution for or in addition to any of said property.

All of the foregoing items of collateral are hereinafter collectively referred to as the "Collateral."  Capitalized terms used above but not otherwise defined shall have the meaning as set forth under Article 9 of the Uniform Commercial Code.

"Obligations" shall mean:
  (a) all indebtedness, liabilities, and obligations whatsoever of Debtor to Secured Party arising under a certain Master Equipment Lease Number 2021-0233 dated as of the date hereof and any related equipment lease schedules, interim financing loan agreements and all amendments, modifications, supplements, substitutions, additions, renewals, replacements and extensions thereof ("Master Lease"), whether direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising; and
  (b) any and all other indebtedness, liabilities, and obligations of Debtor to Secured Party, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, due or to become due, and all amendments, modifications, supplements, substitutions, additions, renewals, replacements and extensions thereof.

Section 1. Representations, Warranties And Covenants Of Debtor.  Debtor hereby represents, warrants and covenants as follows:

  (a) The Collateral is and will continue to be used primarily for business purposes.

1

(b) Debtor is or, to the extent that certain of the Collateral is to be acquired after the date hereof, will be, the owner of the Collateral free from any adverse lien, security interest or encumbrance, and Debtor will defend the Collateral against all claims and demands of all persons at any time claiming any interest therein.

(c) The pledge of the Collateral pursuant to this Agreement creates a valid and perfected first priority security interest in the Collateral, securing the payment and performance when due of the Obligations.

(d) No financing statement covering any Collateral is on file in any public office, other than the financing statements filed pursuant to this Agreement. Debtor authorizes Secured Party or its agent or assigns to file a financing statement with respect to the Collateral pursuant to the Uniform Commercial Code. At the request of Secured Party, Debtor will join with Secured Party in executing one or more (i) financing statements pursuant to the Uniform Commercial Code, (ii) title certificate lien application forms, and (iii) other documents necessary or advisable to perfect the security interests granted hereby, all in form satisfactory to Secured Party, and Debtor will pay the cost of filing the same or filing or recording this Agreement in all public offices wherever filing or recording is deemed by Secured Party to be necessary or desirable. A carbon, photographic, or other reproduction of this Agreement or a financing statement is sufficient as a financing statement.

(e) Debtor will promptly pay any and all taxes, assessments and governmental charges upon the Collateral or for its use or operation.

(f) Debtor will immediately notify Secured Party of any event causing a substantial loss or diminution in the value of all or any material part of the Collateral.

(g) Debtor will keep the Collateral free from any adverse lien, security interest or encumbrance, and in good order and repair. Debtor will defend title to the Collateral and the lien created hereby against the claim of any person other than Secured Party. Debtor will not use the Collateral in violation of law or any policy of insurance thereon.

(h) Debtor will not sell, lease or transfer any of the Collateral or any interest therein (except in the ordinary course of business), without the prior written consent of Secured Party.

(i) Debtor's exact legal name is as set forth above. Debtor is an organization of the type, and is organized in the jurisdiction, set forth above. Debtor will not, without the prior written consent of Secured Party, or as permitted by the Master Lease, change the name of Debtor, the chief executive office of Debtor, the office where Debtor maintains its books and records pertaining to the Collateral or the location of the Collateral. Unless otherwise specified, the chief executive office of Debtor, the location where Debtor maintains its books and records and the location of the Collateral is the address of Debtor set forth above

(j) Debtor will not remove any tangible Collateral from its principal place of business operations at 3933 South Broadway, St. Louis, MO 63118 or any other business location where Collateral is delivered or maintained in the ordinary course of business (collectively the "Business Premises"), except in the ordinary course of business or upon a move of the Business Premises to a new location, without Secured Party's written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(k) Debtor will not sell, transfer or otherwise assign or dispose of any of the Collateral except in the ordinary course of business or if damaged and replaced with Collateral that is the same as the damaged Collateral (of like or greater value) or if obsolete.

(l) Debtor will keep the tangible Collateral in good order and repair (except for ordinary wear and tear).

(m) If Debtor is a partnership, a corporation or limited liability company, it will preserve and maintain its partnership, corporate or limited liability company existence and status and good standing in each State where it conducts business.

(n) Debtor shall obtain and deliver to Secured Party any and all landlord's and mortgagee's waivers, estoppel certificates and other similar documents to confirm, among other things, that the Collateral shall remain personal property and that such persons have no interest in the Collateral.  Debtor shall also deliver, or cause to be delivered, such Uniform Commercial Code termination and partial releases and/or lien waivers or subordinations with respect to the Collateral as Secured Party may request.

(o) If Debtor is a franchise or licensee, Debtor will maintain its franchise and/or licenses and will give Secured Party notice of any threat or action to terminate or withdraw or failure to renew any franchise or license.

(p) Debtor shall keep accurate and complete books of accounts and records covering Debtor's business operations. Secured Party and its employees and agents shall have the right to review such books and records and to copy them and to make extracts therefrom, all at such reasonable times upon reasonable notice and as often as Secured Party may reasonably require.  Debtor will permit Secured Party, its officers, employees and/or agents, at all times, during normal business hours to enter into and upon any premises where the Collateral is located for the purpose of inspecting the Collateral, observing the Collateral's use and otherwise protecting the interests of Secured Party therein.

(q) Debtor will notify Secured Party in writing, promptly, upon learning thereof, of the institution of any suit or administrative proceedings against Debtor with respect to the Collateral, or directly against the Collateral, whether or not the claim is considered by Debtor to be covered by insurance, and of the institution of any suit or administrative proceeding which may adversely affect the operations, financial condition or business of Debtor or Secured Party's security interest in the Collateral.

(r) If Debtor owns any copyrights, trademarks or patents, Debtor will maintain all such intellectual property rights and will give Secured Party notice of any threat or action to terminate or withdraw or failure to renew any such intellectual property rights.

(s) Debtor shall not at any time directly or indirectly assume, guarantee, endorse or otherwise agree, become or remain directly or contingently liable upon or with respect to any obligations or liability of any other person or entity. Secured Party may in its own name or in the names of others, communicate with account debtors in order to verify with them, to Secured Party's satisfaction, the existence, amount and terms of any accounts.

(t) Debtor will have and maintain insurance at all times with respect to the Collateral against risks of fire (including so-called extended coverage), business interruption and such other risks as Secured Party may require, containing such terms, in such form, for such periods and written by such companies as may be

3

acceptable to Secured Party, identifying Secured Party as an additional insured and as loss payee, such insurance to be payable to Secured Party and to provide for at least twenty (20) days' prior written cancellation notice to Secured Party. Debtor shall furnish Secured Party with certificates or other evidence satisfactory to Secured Party of compliance with the foregoing insurance provisions.

(u) Neither the execution of this Agreement nor the granting of the security interest in the Collateral as provided for herein is prohibited by or violates the terms of any agreement, undertaking, order or decree to which Debtor or the Collateral is subject or by which Debtor or the Collateral is bound.

(v) Debtor has full power, authority and legal right to pledge the Collateral pursuant to this Agreement. The individual executing this Agreement on behalf of Debtor is duly authorized to do so without the need to obtain any additional authorization or consent.

<u>Section 2. Events Of Default.</u>  Debtor shall be in default under this Agreement upon the occurrence of any one of the following events (herein referred to as an "Event of Default"):

(a) Any representation or warranty made by Debtor or any guarantor to Secured Party herein shall prove to be false or misleading in any material respect when made;

(b) Default by Debtor or any guarantor in the due observance or performance of any covenant or agreement herein contained;

(c) Default in the payment when due of any Obligation or indebtedness of Debtor or any guarantor to Secured Party secured hereby;

(d) The placing of any attachment on any of the Collateral;

(e) The occurrence of any other default or Event of Default under any of the documents evidencing or securing the Obligations;

(f) Loss, theft, substantial damage or destruction of any of the Collateral which is not fully and adequately covered by insurance;

(g) The calling of a meeting of Debtor's or any guarantors' creditors;

(h) The appointment of a committee of Debtor's or any guarantors' creditors;

(i) The making of an assignment for the benefit of the Debtor's or any guarantors' creditors;

(j) The filing of a voluntary or involuntary petition for or the appointment of a receiver of Debtor's property or any guarantor or guarantor's property;

(k) The filing of a voluntary petition by or an involuntary petition against Debtor under any provision of the federal Bankruptcy Act or any guarantor or guarantor's property;

4

(l)  The issuance of a warrant of attachment or for distraint against any of Debtor's property or any guarantor or guarantor's property;

(m) The issuance of a notice of tax lien against Debtor or Debtor's property or any guarantor or guarantor's property;

(n)  The entry of a judgment against Debtor or Debtor's property or any guarantor or guarantor's property;

(o)  Debtor's failure to pay, withhold, collect, or remit any tax or tax deficiency when assessed or due;

(p)  The dissolution of Debtor's or any guarantors' business;

(q)  The making of a bulk sale by Debtor or the giving of notice of intent to do so;

(r)  The mortgage, pledge or assignment of Debtor's equipment, inventory, accounts receivables or other Collateral as defined above;

(s)  Debtor's or any guarantors' failure to pay any other note or obligation held by Secured Party when due;

(t)  Whenever, in Secured Party's sole opinion, Debtor's financial responsibility becomes impaired or unsatisfactory or the Collateral is not sufficient to secure fully any of the Obligations;

(u)  The indictment or threatened indictment of Debtor or any guarantor of Debtor's Obligations under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against Debtor or any guarantor of Debtor's Obligations pursuant to which the proceedings, penalties or remedies sought or available include forfeiture of any of the property of Debtor or of any guarantor;

(v)  Debtors ceases to conduct its business or is enjoined, restrained or in any way prevented by court order from conducting all or any material part of its business affairs;

(w) There is a material adverse change in the Collateral or in the business of Debtor;

(x)  If any guarantor or any of the Obligations revokes or attempts to revoke the guaranty or dies or dissolves or "winds-up" as applicable; or

(y)  If Debtor is a sole proprietorship or an individual, the death of Debtor or Debtor is declared incompetent.

Section 3. Remedies Upon Event Of Default.  If any Event of Default occurs, Secured Party may cease advancing money or extending credit to or for the benefit of Debtor or any guarantor under any agreement between said parties and may declare all obligations secured hereby to be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived. Secured Party may exercise all the rights and remedies of a secured party under the Uniform Commercial Code as well as all rights provided herein. Secured Party may require Debtor to assemble the Collateral and make it available to Secured Party at a place designated by Secured Party. The requirements of reasonable notice shall be met if notice is mailed, postage prepaid, to Debtor at its address set forth above at least ten (10) days before the time of sale or disposition of the Collateral.

Secured Party shall have the right to demand from the Debtor a list of all accounts assigned hereunder and to notify any and all account debtors to make payment thereof directly to Secured Party.  Secured Party shall also have the right to (i) open all mail addressed to Debtor; (ii) change the Post Office box or mailing address of Debtor; and (iii) use Debtor's stationery and billing forms or facsimiles thereof, for the purpose of collecting accounts and realizing upon the Collateral.  Debtor understands and agrees Secured Party may exercise its rights hereunder without affording Debtor an opportunity for a preseizure hearing before Secured Party, through judicial process or otherwise, takes possession of the Collateral upon the occurrence of an Event of Default, and Debtor expressly waives its constitutional right, if any, to such prior hearing.

So long as the sale of the Collateral is made in a commercially reasonable manner, Secured Party may sell such Collateral on such terms and to such purchaser(s) as Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law, Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, Debtor waives all claims, damages and demands it may acquire against Secured Party arising out of the exercise by it of any rights hereunder. Debtor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Obligations or otherwise. At any such sale, unless prohibited by applicable law, Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. Debtor agrees that it would not be commercially unreasonable for Secured Party to dispose of the Collateral or any portion thereof by utilizing internet sites that provide for the auction of assets of the type included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. Secured Party shall not be obligated to clean up or otherwise prepare the Collateral for sale. Secured Party shall have the right to conduct such sales on Debtor's premises without charge for such sales for such time or times as Secured Party may see fit.  Secured Party is hereby granted license or other right to use, without charge, Debtor's labels, patents, copyrights, rights of use of any matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral, and Debtor's rights under all licenses and all franchise agreements shall inure to Secured Party's benefit.

Section 4. Reasonable Care. Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which Secured Party accords its own property, it being understood that Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by Secured Party of any of the rights and remedies hereunder, shall relieve Debtor from

6

the performance of any obligation on Debtor's part to be performed or observed in respect of any of the Collateral.

Section 5. Expenses.  Whether or not a default has occurred or is continuing Debtor will pay to Secured Party on demand any and all expenses, including reasonable attorneys' fees, incurred or paid by Secured Party in protecting or enforcing any of its rights or remedies hereunder, including but not limited to, pursuing any Obligations or its right to take possession of the Collateral, store and dispose of the same or collect the proceeds thereof or in connection with any bankruptcy or other insolvency proceedings or if the Secured Party becomes a party to any third-party suit or proceeding in connection with this Agreement or any of the foregoing.

Section 6. Waivers, Non-Exclusive Remedies.  No failure or delay on the part of Secured Party in exercising any rights under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise by Secured Party of any of such rights preclude any other or further exercise thereof or the exercise of any other rights with respect to the Collateral, and no waiver as to one Event of Default shall affect the rights of Secured Party as to any other or subsequent Event of Default. All rights and remedies provided herein are cumulative and are not exclusive of any rights or remedies provided by law.

Section 7. Security Interest Absolute. Debtor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All rights of Secured Party and liens and security interests hereunder, and all Obligations of Debtor hereunder, shall be absolute and unconditional irrespective of:

(a) any illegality or lack of validity or enforceability of any Obligation or any related agreement or instrument;

(b) any change in the time, place or manner of payment of, or in any other term of, the Obligations, or any rescission, waiver, amendment or other modification of the Master Lease, this Agreement or any other agreement, including any increase in the Obligations resulting from any extension of additional credit or otherwise;

(c) any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Obligations;

(d) any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Obligations;

(e) any default, failure or delay, willful or otherwise, in the performance of the Obligations;

(f) any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, Debtor against Secured Party; or

(g) any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Master Lease or any existence of or reliance on any representation by Secured Party that might vary the risk of Debtor or otherwise operate as a defense available to, or a legal or equitable discharge of, Debtor or any other grantor, guarantor or surety.

7

Section 8. **Changes In Writing.**  This Agreement and any provision hereof may not be amended, waived or terminated except by a written instrument signed by Secured Party and Debtor.

Section 9. **Governing Law.**  This Agreement shall be construed in accordance with and governed by the laws of Massachusetts except as expressly provided under Article 9 of the Uniform Commercial Code where the collateral is located.

Section 10. **Successors And Assigns.**  All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective heirs, personal representatives, successors and assigns of the parties hereto.

Section 11. **Further Assurances.**  Debtor will execute and deliver to Secured Party, upon Secured Party's request and at Debtor's sole cost and expense, any documents Secured Party deems necessary for the perfection of its security interests or preservation of its rights hereunder.

Section 12. **General Authority.**  Secured Party may, at its election, discharge taxes, liens or security interests or other encumbrances at any time levied or placed upon the Collateral, pay for insurance on the Collateral and pay for the maintenance and preservation of the Collateral. Debtor agrees to reimburse Secured Party on demand for any payment made, or any expense incurred by Secured Party pursuant to the foregoing authorization. Upon request by Secured Party, Debtor will deliver to Secured Party a detailed aging of accounts receivable in form acceptable to Secured Party.

Section 13. **Power Of Attorney.**  Debtor hereby appoints Secured Party its true and lawful attorney with full power of substitution to execute any and all documents Secured Party deems necessary to perfect its security interests hereunder, to demand, collect, receive, receipt for, sue for, compound and give acquittance for, any and all amounts due and to become due on any accounts and to endorse the name of the Debtor on all commercial paper given in payment or part-payment thereof and in its discretion to file any claim or take any other action which Secured Party may deem necessary or appropriate to protect and preserve and realize upon the security interest of Secured Party in any accounts or the proceeds thereof, to obtain, adjust, settle and cancel any insurance and endorse any drafts in payment of any loss, to take any actions permitted by Section 12 hereof and to do all other acts or things contemplated by this Agreement.

Section 14. **Substitution of Security.** At any time while this Agreement is in effect, Debtor shall have the right to post an irrevocable letter of credit in substitution for this Agreement in an amount equal to the then outstanding balance of the Obligations and containing such terms as are reasonably acceptable to Secured Party, and upon such posting Secured Party shall discharge all security interests with respect to the Collateral.

Section 15. **Indemnification:**  Debtor hereby agrees to defend, indemnify, save and keep harmless Secured Party, its agents, employees, successors and assigns, from and against any and all losses, damages (including, without limitation, indirect, special or consequential), environmental hazards or penalties of any kind or nature, injuries (whether to property, person or otherwise), claims, actions and suits, including, without limitation, legal expenses and attorney's fees of whatsoever kind and nature (including, without limitation, reasonable costs and expenses incurred by Secured Party in defending claims or suits brought against it by Debtor or any account debtor) in contract or tort, including, but in no way limited to, Secured Party's strict liability in tort, unless and except to the extent of Secured Party's gross negligence or willful misconduct is the proximate cause of any such loss, damage, penalty, injury, claim,

8

action or suit, and Debtor shall at its own expense defend any and all such actions, arising out of the selection, modification, purchase, ownership, acceptance or rejection of any item of Collateral, and the delivery, possession, maintenance, use, condition (including without limitation latent or other defects, whether or not discoverable by Secured Party or Debtor, and any claim for patent, trademark or copyright infringement) or operation or any item of Collateral by whom so ever used or operated or arising out of or resulting from the condition of any item of Collateral, sold or disposed of after use by Debtor, employee of Debtor, or any designee or lessee of Debtor.  The indemnities and assumptions of liability herein provided for shall continue in full force and effect, notwithstanding the termination of this Agreement, whether by expiration of time, operation of law or otherwise.

Section 16.  <u>Waiver of Jury Trial</u>:  EACH OF THE PARTIES HERETO UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN DEBTOR AND SECURED PARTY RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION, AND/OR THE RELATIONSHIP BETWEEN DEBTOR AND SECURED PARTY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES BETWEEN THE PARTIES. THIS WAIVER IS IRREVOCABLE AND CANNOT BE MODIFIED EITHER ORALLY OR IN WRITING. IN THE EVENT OF LITIGATION, THIS DOCUMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 17.  <u>Miscellaneous Provisions</u>:

    a.  This Agreement is the entire agreement between the Parties and it supersedes all previous agreements (written and oral) with respect to its subject matter.  This Agreement may only be amended by a written instrument executed by all of the Parties.

    b.  Secured Party may assign this Agreement to a third party. Debtor may not assign this Agreement and any attempted assignment is null and void.

    c.  This Agreement may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures hereto and thereto were upon the same instrument.  This Agreement shall become effective when each Party to this Agreement shall have received a counterpart of this Agreement signed by the other Parties to this Agreement. This Agreement may be executed by facsimile or electronic signatures.

    d.  The captions in this Agreement are included for convenience of reference only and shall be ignored in the construction or interpretation of this Agreement.

e. Electronic Execution.  The words "execution," "signed," "signature," and words of similar import in this Security Agreement shall be deemed to include electronic or digital signatures or the keeping of records in electronic form, each of which shall be of the same effect, validity and enforceability as manually executed signatures or a paper based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 USC § 7001 et seq.), the Electronic Signatures and Records Act of 1999 (N.Y. State Tech. Law §§ 301-309), or any other similar state laws based on the Uniform Electronic Transactions Act.

IN WITNESS WHEREOF, this Agreement is executed by Debtor and Secured Party under seal on the date set forth above.

DEBTOR:  SA Hospital Acquisition Group, LLC    SECURED PARTY:  NFS Leasing, Inc.

By:_____    By:_____
Name:_____    Mark Blaisdell, CFO

10

ASSET LIST

**Company**

**Equipment**

*Please attach any supporting documentation available.

11